CASE 31.—PROSECUTION AGAINST JOHN SPROUSE FOR MURDER.—February 26.

# Sprouse v. Commonwealth

Appeal from Carter Circuit Court.

J. B. Hannah, Circuit Judge.

Defendant convicted and appeals—Reversed.

1. Homicide—Evidence—Corpus Delicti—Competency.—In a prosecution for the murder of two children by burning the dwelling house in which they lived, the bones of the two children which were found immediately after the fire and preserved were competent to prove the corpus delicti; and neither the fact that the death of the children as well as the manner thereof was established by other testimony, nor the damaging effect upon accused's defense of their representation to the jury, made their introduction competent.

2. Witnesses—Competency—Knowledge.—In a prosecution for the murder of a little girl by burning the dwelling house in which she lived, the grandmother who had discovered the bones of the girl as well as those of a baby grandchild, whose body was also consumed by the fire, preserved them until the trial and who was able to identify them, was qualified to testify as to whether they were the bones of her grandchildren, and to distinguish those of the little girl from those of the babe, though she was not skilled in anatomy or surgery.

3. Criminal Law—Admissions—Statements in Accused's Presence —Failure to Deny.—Statements made by accused's sister in

hi.· presence at the time of his arrest which were not denied
by him are incompetent against accused, 'and especially so
where when the statement was made he was confronted by
an angry crowd, one of whom had just threatened to kill him
for asserting his innocence.

4. Homicide—Evidence—Motive—Weight.—Though in a prosecu·
tion for murder of a child by burning the house in which she
dwelt, evidence as to threats by defendant as to the result
of a lawsuit involving the land of which the deceased child's
father later became tle owner may have been admissible
to show a motive on defendant's part for burning the house
it was entitled to little, if any, weight in determining the
question of defendant's guilt, because of its remoteness, where
defendant long after the threats were made voluntarily sold
his interest in the land in dispute to decedent's father, and
thereafter the relations between the two were always friendly.

5 Criminal Law—Evidence—Trail by Bloodhounds.—Bloodhounds
used in trailing one charged with murder were shown to be
of fairly good pedigree, but the evidence was indefinite as to
their previous training and insufficient to show that they
had such known acuteness of scent and power of discrimina-
tion, or were so trained and tested in the tracking of human
beings as to prove them to be accurate and reliable. No
precautions were taken tc prevent them from getting· the
scent of persons who had walked about the premises or on
the road taken by them to reach the home of accused. They
had no opportunity to obtain the scent of any article of
wearing apparel or other personal belonging of the supposed
incendiary to guide them in their work, and they were not
taken to or started at any object or place where it was shown
that such supposed incendiary had been or at which the fire
originated. When the dogs finally started in the direction
of defendant's residence, they were attended by an excited
crowd, whose presence tended to confuse them, and together
with their evident inexperience made it necessary for their
owner to urge them on in order to make them follow the
supposed trail. Held, that the evidence as to the trailing
done by the dogs was incompetent.

6. Criminal Law—Review—Harmless Error—Admission of Evi-
dence.—The admission of incompetent evidence as to the
trailing of accused by bloodhounds was reversible error where
there was no other proof appearing in the record establishing
defendant's guilt.

7. Criminal Law—Review—Verdicts.—Where there is any evi-
dence to support a verdict, it should not be disturbed on
appeal

Sprouse v. Commonwealth.

8. Homicide—Evidence—Sufficiency.—In a prosecution for murdering a child by setting fire to the house in which she dwelt, evidence held insufficient to support a conviction.

W. D. O'NEAL, Jr., for appellant.

FRANK PRATER, and M. D. PERKINS of counsel.

POINTS.

1. The bloodhounds used were not laid on any trail and the evidence did not come within the rule laid down by this court, and should not have been permitted to go to the jury.

2. It was improper to admit statements, as evidence, made by appellant's sister in his presence to which he made no reply, he at the time being accused, surrounded and confronted by about thirty men and two bloodhounds. He was a prisoner at the time in fact, whether formally arrested or not. It is especially inadmissable as appellant immediately on being accused, made a flat denial of his guilt.

3. Statements made to witnesses by appellant relating to his land controversy with another person before Cooper bought it, is wholly disconnected from the crime charged and not admissable in evidence.

4. On the charge of murder of Dovie Cooper, evidence of injury to her parents by burns upon them, neither aided in proving Dovie Cooper's death, nor appellants connection therewith, and should not have been admitted.

5. The exhibition before the jury of a box purporting to contain the bones of both Dovie Cooper and Mary Cooper, and testified to by their grandmother, should not have been permitted.

6. The argument of counsel for the Commononwealth of matters not given in evidence, as facts material to the case, and excepted to at the time, should not have been permitted.

7. The Commonwealth's attorney should not have been permitted over objection of appellant to call the attention of the jury to the burns on the parents of deceased and appeal to the jury to render a verdict that would punish him, for the injury he had done them.

AUTHORITIES CITED FOR APPELLANT.

Pedigo v. Comlth., 103 Ky. 41; Denham v. Comlth., 119 Ky. 508, Am. and Eng. Annotated cases vol. 3, 897; vol. 8, 108; vol 10, 1127; 98 Ala. 10; Newman v. Comlth., 28 Ky. Law Rep. 81

(88 S. W. 1089); Comlth. v. Brailey, 134 Mass. 530; Lawson v. State, 20 Ala. 80; Ware v. State, 96 Geo. 351; Brown v. State, 78 Miss. 639; Law v. State, 108 Tenn. 127; Watt v. People, 126 Ill. 28; State v. Burns, 124 Iowa 207.

JAMES BREATHITT, Atty. Genl. and TOM B. McGREGOR, Asst. Atty. Genl. for Commonwealth.

## AUTHORITIES.

Pedigo v. Commonwealth, 103 Ky. 41; Allen v. Commonwealth, 26 Ky. Law Rep. 810; Denham v. Commonwealth, 27 Ky. Law Rep. 175; Simpson v. State, 111 Ala. 6; State v. Hall, 4 Ohio Decisions, 147; McClurg v. Brenton, 123 Iowa, 368; Brott v. State, 97 N. W. Rep. 593; State v. Moore, 129 N. C. 494; Parker v. State (Tex.), 3 A. & E. Ann. Cas. 893; Hargrove v. State (Ala.), 10 A. & E. Ann. Cac. 1126; Richardson v. State (Ala.), 8 A. & E. Cas. 108; Merriwether v. Commonwealth, 118 Ky. 570; Annotated Notes on same, 4 A. & E. Ann. Cas. 1042; Jackson v. Commonwealth, 100 Ky. 239; Porter v. Commonwealth, 22 Ky. Law Rep 1659; Turner v. State (Tenn.), 15 S. W. 838; State v. Moxley, 14 S. W. 556; Seaborn v. Commonwealth, 25 Ky. Law Rep. 2303; Bess v. Commonwealth, 26 Ky. Law Rep. 839; Howard v. Commonwealth, 24 Ky. Law Rep. 952; Ireland v. Commonwealth, 22 Ky. Law Rep. 478; Wharton on Homicide, 610; 19 American Reporter, 401; Housman v. Commonwealth, 33 Rep. 311.

OPINION OF THE COURT BY CHIEF JUSTICE SETTLE— Reversing.

The appellant John Sprouse and Alonzo Kelly were jointly indicted in the Lawrence circuit court for the murder of Dovie Cooper by maliciously and feloniously burning a dwelling house in which she lived, thereby consuming her body and causing death. Upon appellant's application a change of venue was granted by the Lawrence circuit court and the case transferred to Carter county. He was given a separate trial in the circuit court of that county, and the jury returned a verdict finding him guilty as charged, and fixing his punishment at confinement in

the penitentiary for life. Judgment was entered in conformity to the verdict. Appellant was refused a new trial, and by this appeal seeks a reversal of the judgment of conviction.

The facts furnished by the bill of evidence are as follows: The dwelling house appellant was accused of burning belonged to and was occupied as a residence by Charles Cooper. The house was a one-story frame building, consisting of two front rooms and hall, and an ell of three rooms. The fire occurred on the night of September 14, 1908. Cooper's family consisted at the time of himself, wife, and four children, a maid and man servant. On the night of the fire the family retired at the usual hour. Cooper and his wife slept in one of the front rooms; she occupying a bed with her twin babies 10 months old and Cooper another with his little daughter, Dovie, four years of age. The hired girl and another of the Cooper children, Grace, seven years of age, occupied a bed in the hall between the front rooms, Griffith, the hired man, one in the other front room. The fire was first discovered by Griffith, who testified that, when he awoke, the entire room in which he was sleeping seemed to be in a blaze. He at once gave the alarm to the other members of the family, and seizing the child, Grace, escaped with her from the burning building. The hired girl also escaped. When awakened by Griffith, Cooper and his wife sprang from their beds, and Mrs. Cooper opened the door leading from her room into the dining room in the rear of it. When she did this, the flames from the dining room burst into her room with such force as to knock her down. With great difficulty and imminent risk to his own life, Cooper carried his wife and one of the twins from the building in time to save

their lives, but two of the children, Dovie, and Mary, one of the twins, he could not save, and not withstanding every effort on his part to rescue them they were burned to death. Cooper and his wife were so burned as to be permanently disfigured, and the former's eyes so injured as to greatly impair his vision. The members of the family were unable to state the origin of the fire. They testified that there was no fire in any room of the house when they retired for the night, or, if so, they were unaware of it, and that there were no matches in the house, except, perhaps, in the room occupied by Cooper and wife. Cooper and Griffith also testified that after their escape from the house Cooper, being afraid the barn would catch fire, turned some mules out of it into a lot, and in going to the barn saw that the outside wall of the dining room next to the barn was burning, from which he inferred that the fire had been started at that place, and on the outside, by an incendiary. But, in view of the fierceness of the fire on the inside of the house and that it had extended to the front rooms and hall, as well as the inside of the dining room when the family were awakened, it is more probable that it started on the inside of the dining room or somewhere on the roof, and had burned through the wall of the dining room from the inside at the point where Cooper discovered it in going to the barn. In other words, in view of the progress made by the fire inside the several rooms mentioned, its progress on the outside of the dining room wall would have been greater where Cooper saw it on the way to the barn, if the fire had in fact commenced at that point. The little girl, Grace, who slept with the hired girl in the hall, testified that when first awakened she smelled coal oil, but no other member of the family detected

such an odor, and there was no evidence that the fire by which the house was consumed was started with oil, nor was there a discovery of the presence about the building or on the premises of kindling or other inflammable material which might have been used to fire it.   It was shown by several of the Cooper family that there was before and at the time of the fire coal oil in the house for illuminating purposes, and it is not unreasonable to suppose that this had been reached by the fire and ignited thereby causing the odor discovered by Grace.   The further fact was disclosed by the evidence that the shingle roof of the Cooper house was old and in many places covered with moss, which during the dry weather prevailing throughout the summer and fall of 1908 could readily have been set afire even by contact with a live spark.

It further appears that at an early hour on the morning after the fire a pair of bloodhounds were brought to the scene of the fire by their owner, Mullen, for the purpose of assisting in ascertaining whether the burning of the Cooper house was the work of an incendiary, and of trailing and apprehending, if possible, such incendiary.   The dogs, after some trailing about the premises, principally in the barn lot and on the branch back of it, seemed to strike no scent until they reached a cross-fence, from which they went through the woods some distance, and then into the country road, which they followed, with an occasional run out of it to the right or left, until they reached the residence of Frank Kelly, but without entering the yard went on to where the road forked, and there for a while followed the trail of a woman who had previously passed that way, and then proceeded to the home of appellant, entered the yard through an open gate, trailed through a porch around

the house to a door, where they stopped. The door was opened by a sister of appellant, and the party accompanying the dogs with them entered the house and discovered appellant standing near the fireplace. Mullen, the owner of the dogs, then pointed to appellant, and said to a deputy sheriff present, "There is the man who burned Cooper's house." Whereupon appellant declared the dogs had made a mistake; that he was at home all night, and the dogs had tracked the wrong man. When appellant made this declaration, Mullen became angry, cursed him for disputing the work of his dogs, and demanded of the deputy sheriff his gun that he might shoot appellant. Immediately following this scene appellant's sister denied his guilt, declared he had been at home all of the previous night, and also said: "I know who your dogs are tracing. I heard some one go through our porch last night about 10 o'clock, and don't you remember, John, I told you when you came in?" To this statement appellant made no reply. Appellant was then arrested and taken to Louisa under guard as there were threats of mob violence. On the way he repeatedly asserted his innocence.

It appeared from the evidence that two years or more before the burning of Cooper's house the land upon which it stood was owned by appellant's grandparents, John and Martha Kelly, who deeded it to appellant in consideration of his undertaking to support and care for them. Appellant seems to have failed to comply with his contract, and his grandparents by deed conveyed the land to their daughter, America Castle, for a like consideration. After the death of the grantors, appellant and Mrs. Castle became involved in a lawsuit in which each claimed the land; but, before the case went to judgment, the

litigants sold their respective interests to Charles
Cooper, who owned it at the time the dwelling house
was burned. The lawsuit caused much bitterness of
feeling between the appellant and Mrs. Castle, dur-
ing which appellant more than once was heard to say
in substance that if Mrs. Castle got the house or
whoever got the house would have a hard time keep-
ing it. These statements were made many months or
a year before Cooper's purchase of the land, and his
name was not mentioned in connection with them.
The evidence introduced by appellant, consisting of
his own testimony and that of numerous witnesses,
conduced to prove that he was at his home· during
the whole of the night on which the burning of
Cooper's house occurred; that he and Cooper were on
friendly terms; that appellant had voluntarily sold ·
Cooper his interest in the Kelly land and had worked
for him only a short time previous to the burning of
the house. Several of appellant's witnesses testified
that when Mullen, the owner of the bloodhounds, ar-
rived at Cooper's with them, he did not keep their
heads up or hold them in hand to prevent their get-
ting the scent of persons who walked about the prem-
ises and up and down the road, and that no effort was
made by Cooper to keep persons from passing over
and contiguous to the ground upon which the house
had stood. These witnesses further testified that in
starting the dogs to trailing no object or point was
selected as indicating where the supposed incendiary
had been, nor were they taken to any place where
the fire was thought to have started; that in proceed-
ing to appellant's house the dogs kept their noses much
of the time in the air, and would only put them to
the ground when hissed or urged on by Mullen, who
with quite a crowd accompanied them on the way.

Appellant insists that much incompetent evidence was admitted on the trial to his prejudice. One of his complaints on this score is as to the introduction before the jury of the bones of the two children of Cooper whose bodies were consumed with the house. The bones were found immediately after the fire and preserved by Mrs. Frances Cooper, mother of Charles Cooper. The evidence was competent to prove the corpus delicti. Though not skilled in anatomy or surgery, Mrs. Cooper had, as already stated, discovered the bones, and having placed them in a box, and kept them until the trial, she was able to identify them, and therefore qualified to testify as to whether they were the bones of her grandchildren, and to distinguish those of the little girl from those of the babe. As the death of the two children, as well as the manner thereof, was indubitably established by other testimony, the introduction of the bones was unnecessary; but neither that fact nor the damaging effect upon appellant's defense of their presentation to the jury made their introduction incompetent.

Appellant further complains that the court erred in permitting proof of the statement made by appellant's sister at the time of his arrest to the effect that she called his attention after he came into the house on the night of the fire to the fact of some one's having passed through the porch, and in permitting proof of appellant's failing to reply to the statement of the sister. We think this testimony was clearly incompetent. Appellant was under arrest when the statement was made by his sister; moreover, he was at the time confronted by an angry crowd, not to say mob, of 30 men, and had just been threatened with death by Mullen, the owner of the dogs, for asserting his innocence, and thereby ques-

tioning their accuracy of skill and scent, and this threat had been accompanied by a demand from Mullen for the gun of the deputy sheriff with which to carry it into execution. In brief, appellant was at the time under duress, and the menace to his life resulting from the mere assertion of his innocence but a moment before was well calculated to seal his lips and prevent a reply to the ill-timed, though well-meant, declaration of his sister. Indeed, in view of his manifest fright and danger, it may well be doubted whether he heard the statement of his sister, or, if hearing, understood it. Evidence of such a statement as that of the sister made in the presence of one charged with a crime, when not denied, is sometimes admissible, but never so when not heard or understood by him, or when by reason of restraint or duress he is not at liberty to reply. Newman v. Commonwealth, 88 S. W. 1089, 28 Ky. Law Rep. 81; Merriwether v. Commonwealth, 118 Ky. 870, 82 S. W. 592, 26 Ky. Law Rep. 793. In view of the circumstances and the rule stated, we do not hesitate to say that the evidence in question was incompetent.

Appellant also complains of the admission by the court of the statements or threats proved by the commonwealth to have been made by him with respect to the result of the lawsuit with America Castle over the land, of which Cooper later became the owner. This evidence was introduced for the purpose of showing a motive on the part of appellant for burning Cooper's house. We are disinclined to say the evidence was incompetent, and do not, therefore, so decide; but in view of its remoteness the fact that appellant long after the threats were made voluntarily sold his interest in the land to Cooper, and the further fact that the relations between them were

always friendly, we think the evidence entitled to little, if any, weight in determining the question of appellant's guilt or innocence.

It is insisted for appellant that evidence of the trailing done by the dogs should have been excluded. In Pedigo v. Commonwealth, 103 Ky. 41, 44 S. W. 143, 42 L. R. A. 432, 82 Am. St. Rep. 566, 19 Ky. Law Rep. 1723, it was held that testimony as to trailing by bloodhounds of one charged with crime may be permitted to go to the jury, for what it is worth, as one of the circumstances which may tend to connect the defendant with the crime, "when it is shown by some one having personal knowledge of the fact that the dog in question is of pure blood and of a stock characterized by acuteness of scent and power of discrimination, and is itself possessed of these qualities and has been trained or tested in their exercise in the tracking of human beings, and that the dog so trained or tested was laid on the trail, whether visible or not, concerning which testimony has been admitted at the point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicated to have been made by him." In Denham v. Commonwealth, 119 Ky. 508, 27 Ky. Law Rep. 171, 84 S. W. 538, evidence of the trailing of the defendant by bloodhounds was held to have been properly admitted, but their work was done on the same night the crime was committed, and, upon reaching the place of the crime, their heads were held up when they were taken from the wagon and until put on the trail. It was also made to appear that care was taken by the family on whose premises the crime was committed to prevent persons from going to or about the place of its commission in order that the blood-

hounds might not be confused or obstructed in fol-
lowing the trail of the criminal.  The dogs were taken
to the point where the crime was committed, and
there immediately struck the trail, and followed it
to the house of the person suspected of the crime,
who, with an accomplice, was arrested, and both later
tried and convicted.  The dogs through whose instru-
mentality the criminals were thus apprehended and
convicted were shown to be of approved pedigree and
carefully trained in tracking men; the older one hav-
ing run down and aided in the capture of 63 crim-
inals, and the younger in the capture of several.  In
view of the facts mentioned, the court in that case
said of the service rendered by the dogs: "There-
fore the testimony as to the trailing done by them in
the capture of appellant and Cottrell was properly
allowed to go to the jury for what it was worth as
one of the circumstances tending to connect the ap-
pellant with the crime for which he was convicted.
The testimony was, as we think, sustained, and the
guilt of appellant, as thereby indicated, confirmed, by
Vanarsdall's identification of him by his size and
voice, the finding by the arresting officer of money
concealed in his drawers leg, the confession of his
accomplice, and other circumstances of equal weight
shown by the record."  The evidence in the instant
case shows that the dogs through whose agency
appellant was arrested were of fairly good pedigree,
but it was indefinite as to their previous training and
insufficient to demonstrate that they were possessed
of such known acuteness of scent and power of dis-
crimination, or so trained and tested in their exer-
cise in the tracking of human beings as proved them
accurate and reliable.  Moreover, according to the
evidence, no precautions were taken by the owner to

prevent them from getting the scent or upon the
track of persons who had walked about the premises
or up and down the road taken by them to reach the
home of appellant. They had no opportunity to
obtain a scent of any article of wearing apparel or
other personal belonging to appellant to guide them
in their work, and they were not taken to or started
at any object or place where it was known or indi-
cated the supposed incendiary had been, or at which
the fire originated. When the dogs finally started in
the direction of appellant's residence, they were
attended by an excited crowd whose presence doubt-
less served to confuse them, and, together with their
evident inexperience, made it necessary, as testified
by some of the witnesses, for their owner to hiss or
urge them on in order to make them follow the sup-
posed trail. It is not consonant with our sense of
justice to hold competent the testimony of the so-
called trailing done by the dogs, and tested by the
rule announced in Pedigo v. Commonwealth and Den-
ham v. Commonwealth, supra, it must be declared
incompetent. If there were other proof of fact or
circumstance appearing in the record which tended
to establish appellant's guilt, we would be inclined
to say that the testimony in question would not have
been so prejudicial as to have justified a reversal; but,
as there is not, we think the trial court should have
excluded it, and that its failure to do so was preju-
dicial error. If the case should have gone to the
jury, the instructions given by the trial court well
stated the law with respect to the crime charged in
the indictment and the manner of its commission, as
therein set forth, but a careful examination of the
record convinces us that there was no evidence pre-
sented which conduced in the slightest degree to

establish appellant's guilt. In expressing this con-
clusion, we are not unmindful of the rule that, where
there is any evidence to support the verdict of the
jury, it should not be disturbed; but there is in this
case no evidence to support the verdict. Such as was
relevant was purely circumstantial and reasonably
explainable consistent with appellant's innocence.
Neither a motive nor opportunity on the part of
appellant to burn Cooper's house or thereby take the
lives of his children was shown, nor was it even made
to appear that the burning of the house was the work
of an incendiary.

In the face of the presumption of innocence with
which the law shields appellant, the evidence relied
on by the commonwealth does not justify more than
a suspicion of his guilt, and, this being true, the
presumption of innocence entitled him to an acquittal
at the hands of the jury as a matter of law and of
right. The following excerpt from the opinion of this
court in the case of Wilkerson v. Commonwealth, 76
S. W. 359, 25 Ky. Law Rep. 780, will aptly express
our meaning: "Society is interested in the punish-
ment of criminals in order that crime may be pre-
vented. But the law cannot afford to punish even a
criminal without evidence of his guilt. It may be
possible, of course, that appellant is guilty of this
crime. If so, it is unfortunate for the commonwealth
that the evidence of it has not been found, but it
would be far worse if the law allowed one accused of
such a crime to be convicted and punished in the
absence of all evidence of his guilt. The courts are
not unmindful of the great prevalence of crime, and
of the crying need for its speedy punishment. Guilty
men may have escaped punishment altogether, others
may have been punished too lightly for their crimes,

others may have unreasonably delayed their punishment, but none of these conditions, nor all of them together can ever warrant the punishment of a man by the law of an offense without evidence of his guilt, and a legal trial of the fact.'' On the former trial the circuit court should have peremptorily instructed the jury to find appellant not guilty. If upon a retrial the evidence is substantially the same as on the first trial, the peremptory instruction directing an acquittal should be given by the court.

Wherefore the judgment is reversed and cause remanded for a new trial consistent with the opinion.