## Crews v. Commonwealth.

(Decided October 3, 1913).

### Appeal from Monroe Circuit Court.

1. Appeal—Refusal of Trial Court To Make Paper Part of Record —Review—Bill of Exceptions.—When a trial judge refuses to make a paper a part of the record, the only way of getting it into the record for the purposes of review is by a bill of exceptions; and the mere act of the clerk in copying the paper into the transcript, when it has not been made a part of the record either by an order of the court filing it, or by a bill of exceptions, amounts to nothing.

2. Appeal—Refusal to Permit Affidavit to be Made Part of Bill of Exceptions—Clerk Copying Into Transcript—Striking From Record.—Where a defendant offered to file an affidavit, and the court overruled the motion, and the defendant then moved the court to permit the affidavit to be filed and made a part of the bill of exceptions, and the court also overruled said motion; and the clerk in making up the transcript copied said affidavit into it, the affidavit will, upon motion, be stricken from the record.

3. Verdict—Evidence Insufficient to Support.—Evidence under which a conviction for murder was returned, examined and found insufficient to support the verdict.

JACKSON, DENHAM & COPAS and SPEAR & DENTON for appellant.

JAMES GARNETT, Attorney General for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

Martha Crews and her 17 year old son, Willie Knuckles, were indicted, convicted, and given life sentences in the penitentiary for the murder of Graven Crews, the husband of Martha Crews, on Sunday, May 19, 1912. Martha Crews appeals and asks a reversal upon the single ground that the evidence against her does not sustain the verdict.

1. Preliminary to the consideration of the appeal upon its merits, we will dispose of the motion of the Commonwealth to strike from the record the affidavit of Willie Knuckles, which was tendered about four months after the trial of the case. In that affidavit Willie Knuckles confessed that he alone murdered his step-father, and that his mother had nothing whatever to do with it.

When the appellant offered to file the affidavit, the court overruled the motion; whereupon appellant further moved the court to permit the affidavit to be filed and made a part of the bill of exceptions; but this motion was likewise overruled. Exceptions were duly taken to these rulings of the court, but no effort was ever made to get the affidavit into the record by a bill of exceptions. The clerk, however, copied it into the record when he came to make it for this appeal. The circuit judge properly overruled appellant's motion to file the affidavit, since it constituted no part whatever of the proceedings on the trial. The trial was had at the December term 1912, and the affidavit was not tendered until the April term 1913. When the trial judge refuses to make a paper a part of the record, the only way of getting it into the record for the purposes of review, is by a bill of exceptions; the mere act of the clerk in copying the paper into the transcript when it has not been made a part of the record, either by an order of the court filing it, or by a bill of exceptions, amounts to nothing. The affidavit, therefore, has no proper place in this record, and the motion of the Commonwealth to strike it from the record, will have to be sustained.

2. The record for this appeal was not well or carefully prepared. The testimony was not taken by a stenographer, but was written out from memory about four months after the trial. It is fragmentary, and in many respects unsatisfactory. It appears, however, that the appellant, Martha Crews, is about fifty years old, and has been twice married. Her husband, Graven Crews, also had been twice married. Each of them had children by the first marriage. Martha and Graven had married about two years before Graven's death. The evidence is uncontradicted that she was uniformly kind to his children. Upon this subject his son Haden Crews, who lived at home, testified, that 'if there was ever any trouble in the family, I never knew it; mother and all of them got along well.''

Her son, Willie Knuckles, had formerly lived at home with his mother and step-father, but some months before the death of Graven Crews, Willie had gone to live with his uncle Elvin Page, who lived about four miles from the Crews home.

The appellant, with her husband, and three of his children, were, at the time of his death, living together. On Sunday, May 19, 1912, the day of Graven Crews' death, he and his wife had visited their brother-in-law, John Humes, who lived some three miles away. While there, Mrs. Crews became ill and her husband carried her home about four o'clock in a buggy. According to appellant's testimony they reached home about four o'clock and ate supper about sun down. She then washed the dishes, did some little repairing upon Graven's clothes and went to bed early, leaving her husband sitting up.

Haden Crews, the sixteen year old son of Graven Crews, and Burrell Crews, another son, eleven years old, slept in an adjoining room, while a still younger child, Bessie Crews, slept in the room with her parents. Appellant says her husband gave her some medicine after she went to bed, and said he would remain up until the horses got through eating; that she went to sleep, and next saw him at her bed where he aroused her, calling "Mama, Mama"; that she got up hastily, and seeing that he was sinking, she held him in her arms and helped him down upon the floor as easily as she could, drawing his head into her lap. She and Bessie both called for Haden, and told him to call Tom Crews or some one else over the telephone. After some difficulty some one answered

the telephone, to whom appellant said that her husband had fallen dead, and asking the person at the telephone to come to the house at once. She also told Burrell Crews to go for Tom Crews.

Bessie Crews, the child who was sleeping in the room with her father and her mother, did not testify; but Haden Crews, the 16-year-old son who was sleeping in the adjoining room, testified that he went to bed that night a little before dark, and went to sleep, and did not awake until he heard the report of a gun. He then got up and ran to the door between the two rooms and found it closed by a button on the other side of the door. He pushed the button off and entered the room, where he found his father lying on the floor with appellant standing over him. He asked her how it happened, but she did not answer him. He says appellant said to him that if he ever told it she would kill him. She then directed Haden to go and tell Tom Crews to come up there, and to tell Tom that his father had fallen dead. Haden said his stepmother telephoned to several of the children, and to other people who later came to the house that night, and that she began to "shout and take on", although she did not shed a tear before that time. Haden Crews further says that about a month before the death of his father he heard appellant call her son Willie Knuckles over the phone, and tell him to come to her house. Haden says Willie Knuckles and his mother were frequently in the kitchen together in close conversation, and that when any of the family would approach them, they would quit talking until the others left; that the door to the room in which he was sleeping was fastened on the night of his father's death, but had never been fastened before. He told his step-mother that she had killed his father, whereupon she said to him if he ever said what he knew she would kill him. He further says that his step-mother kept him with her until after the examining trial, and that he was afraid of her.

Upon his cross-examination Haden admitted that he had testified before the examining court that he did not hear the report of the gun, but that he was awakened by his mother calling for him. He explains this discrepancy in his testimony by saying that at the time of the examining trial he was afraid the appellant would kill him if he had then testified as he afterwards did upon the final trial. He lived with his step-mother for three

weeks after his father's death, and she never threatened him any more, nor ever told him not to tell what he knew.
: Burrell Crews, the 11-year-old boy who was sleeping with his brother Haden in the adjoining room, went to bed leaving his father sitting on the porch. Haden aroused him, telling him that his father was dead, whereupon he went into the other room where his mother told him to go to Tom Crews' and get Tom to come to the house. He further testifies about the visit of his father and step-mother to John Humes and their return in the buggy; that he went to bed about dark; that his father, mother and Willie Knuckles, and all of them, got along well together; and that his step-mother was as good to him as if she had been his own mother. Being recalled, Burrell further testified that when he went into the room that night and appellant told him to go for Tom Crews, she told the witness not to tell him anything else, and if he did she would kill him and all the rest of the Crews. He did not, however, tell of this last incident when he testified at the examining trial.

Ina Chapman testified that while she was at Willie Palmore's she heard a conversation between Willie Knuckles and his mother over the telephone, in which appellant wanted Willie to come up there and work, and he said he did not know whether he was going to come or not, whereupon his mother, after she had talked to Willie about a mule, said, "I want to know if you are going to come up here and do what I want you to do?" This conversation occurred about three or four weeks before Graven's death.

Sam Hagan, who lived within half a mile of Graven Crews, testified that he visited Graven and his wife and they returned the visits; that he never heard them have a short word with each other, and that they always got along smoothly. He went to the house shortly after the shooting and found Graven dead and lying on the floor, with his head on a pillow. Appellant told him Graven had fallen on the floor, and that she did not know what caused it. Graven had been shot in the breast with a shot gun.

.. There was but little blood on his clothing, and some on the floor, while his outer shirt had scarcely any upon it. Graven was dressed only in his night-clothes, and there were only two very small spots of blood on the floor when he was taken up. Appellant told him that

Graven had aroused her by calling, "O Mama, Mama." She said nothing about hearing the gun shot.

Charlie Hagan, a neighbor, says he heard a gun fired in the direction of Crews' residence "about good dark" and that he went to the Crews' house that night and heard Mrs. Crews crying before he entered the house. He found Graven lying dead upon the floor, in his night-clothes. Appellant said to him substantially the same she had told Sam Hagan, as to how it all happened.

Likewise, Tom Crews heard a gun shot about eight o'clock, and shortly thereafter one of Graven's little boys came to Tom's house with the message that his father had fallen dead. Tom went to Graven Crews' house and found Sam Hagan, Charlie Hagan and others there.

Maud Bartley testified that appellant and Willie Knuckles passed her mother's house sometime before the death of Graven Crews, while Maud was on the porch. She asked Mrs. Crews where she had been, and appellant said she had been to Waterview; that she had wanted to go to the meeting the night before, but that she had to stay at home "with Graven Crews' young ones, and that she was getting mighty tired of having to do that way." Maud Bartley had had no former acquaintance with appellant, although she knew her by sight.

Laura Crews testified to a conversation with Martha Crews two or three weeks before Graven's death, in which Martha said she was going to Elvin Page's to have a secret talk with Willie about a transaction between Willie and Graven Crews concerning a colt that both claimed. The witness says appellant told her she had told Graven to get out a warrant for Willie, but that she had told Willie to take the colt. She further says Martha told her that Willie didn't kill Graven Crews by himself; that he had a partner that was older than Willie.

Myrtle Shaw says she was at Graven Crews' home the next day after his death when Willie Knuckles came there, and that when he came his mother told him to pray and pray earnestly; that she had prayed all the day before and all night, and that she had got forgiveness for what she had done; that Henderson Knuckles, her first husband, and Graven Crews, were both standing at the pearly gates to welcome her in; and that appellant said, "If Willie did do that they had got him off over there and stuffed him full of Coffee's liquor which caused him.

to do that, if he did do it.'' Myrtle Shaw is a niece of Graven Crews.

Lucy Crews testifies to substantially the same conversation.

Bob Wilson stopped at the home of Graven Crews a few days before his death. Graven was not at home, but in a conversation with Mrs. Crews she asked Wilson if he ever made any mistakes, saying that she had made a mistake when she married Graven Crews; that she had her clothes packed to go to Illinois when she married him; that she ought to have gone; that he was mean to her children, and she didn't see how she could stand it much longer; and that a few nights before her clothing had caught on fire and she came near burning to death while Graven was gone hunting. He says she seemed to be mad because her husband had left her by herself. There is no evidence that Graven ever mistreated appellant's children, unless the transaction about the mule colt, hereinafter explained, could be so considered.

The foregoing is the substance of the Commonwealth's testimony in so far as it related to appellant. We have omitted that portion of it which related exclusively to Willie Knuckles, since it has no bearing upon this case.

In testifying in her own behalf, Mrs. Crews explained the conversation over the telephone with her son Willie Knuckles by saying, that sometime previous her husband had given Willie a mule colt, but had afterwards traded it for a horse colt, which he claimed as his own. This angered Willie and he left home and went to live with Elvin Page. Subsequently, however, Graven Crews had attempted to get Willie to return home and make a crop with him. Willie had considered the proposition but had not finally made up his mind about it, although his mother seemed to be under the impression that he had accepted it; and it was in connection with that proposition to him by his step-father that his mother was urging him to do what he had promised her he would do. Appellant further explains the conversation above testified to by Laura Crews and denies the most substantial part of it. She admits that she probably may have made the remark to Wilson about her husband going fox hunting and leaving her at night, but she denies that she told him she had made a mistake when she married Graven Crews; on the contrary she says she made no mistake when she married

him. Furthermore, she contradicts Maud Bartley, and explains that what she said to her was as follows: "Yes, I told Willie to pray, and I had prayed. I can't read; and Graven had been reading the Bible on Saturday night before his death and making prayers, and said none of us prayed as much as we ought to; that we knew not when we should be taken off; and his sudden taking off brought his words home to me, and I did pray all night and all day.' And when Willie came into the house in charge of the Sheriff, that was the first I knew of his being charged with the murder; but I didn't know whether he was innocent or guilty, and I advised him to pray and pray earnestly. I never killed Graven Crews, nor I never conspired with Willie or any one else to kill him, or ever thought or had information in any way that Willie or anybody was going to kill him. I hadn't seen Willie for three weeks before the killing."

Julia Humes, a sister of Graven Crews, corroborates appellant to some extent in her testimony as to what was said by appellant in her conversation with Laura Crews.

It is insisted on behalf of appellant that this evidence does not sustain the verdict against her. The indictment charges a conspiracy between appellant and her son Willie Knuckles to murder Graven Crews, and that in carrying out the conspiracy they shot and killed him, or that one of them did. It will be noticed, however, that there is no evidence that appellant fired the shot, or that she had a gun. Furthermore, no motive for the crime upon the part of appellant, is shown. On the contrary, it appears that she lived happily with her husband, and his children unanimously testify to their good treatment at her hands.

The alleged conspiracy is not sustained by competent testimony, and rests, so far as the record before us shows it, upon unsupported suspicion, which is neither competent nor satisfying.

Upon the whole case the judgment is reversed for a new trial.