## Daniel v. Commonwealth.

(Decided June 9, 1916.)

Appeal from Todd Circuit Court.

Homicide—Threats—Evidence.—The proof of a mere threat, by one accused of a homicide against the deceased, is not any evidence of his guilt of the homicide, where there is an entire absence of

any fact or circumstance, which in any way connects the accused with the perpetration of the crime.

C. A. DENNY for appellant.

M. M. LOGAN, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HURT—Reversing.

In May, 1915, Will Clardy, a colored man, was assassinated, in Todd county, and the appellant, Cephas Daniel, was accused of being the perpetrator of the crime, and an indictment for murder was returned against him, accusing him of the crime. Thereafter he was tried and found guilty by the jury, which, by its verdict, fixed his penalty at imprisonment for life and the court rendered judgment in accordance therewith. His motion for a new trial being overruled, he has appealed to this court and seeks a reversal of the judgment upon the ground that there was not any evidence heard against him, upon his trial, which conduced to prove his guilt of the crime, or to support the verdict of the jury and that the court below was, in error, in overruling his motion for a peremptory instruction to the jury, directing his acquittal and his motion for a new trial.

The appellant was a colored man and a laborer upon the farm of one, Mr. Watts, where he had lived for something over a year preceding the perpetration of the crime for which he was indicted, and a woman, whose name was Lula Jefferson, and one of his sisters, resided with him. He and the Jefferson woman had never been married, but seemed to have lived together as husband and wife. The deceased, Will Clardy, during the year 1915, preceding his death, was a hired laborer upon the farm of one Brockman, whose residence was from a mile and one-half to two miles distant from the residence of the appellant. Seven or eight months previous to his death, the deceased and the appellant had an altercation at a negro barbecue and dance at a place called Hatcher's Springs, which grew out of the fact that the appellant discovered the deceased and Lula Jefferson engaged in a conversation.

In the yard which surrounded the dwelling house of Brockman there was situated a small house, which was occupied by a colored man, Walker Ferguson, and his wife and three children. The fence which surrounded

the yard approached the house in which Ferguson lived at either end, which caused a portion of the house to be within the yard and the other portion of it in the field, which was upon the outside of the fence around the yard. On the side of the house which was in the field, there was a window, which looked out into the field. The field was being cultivated in a crop of corn, except a narrow strip, which was next to Ferguson's house. Over the window, which looked into the field, was an old green window shade, very much worn and was transparent to such an extent that a person at the window upon the outside of the house could discover persons in the room at night, when the room was lighted. Mr. Brockman, the owner of the farm, where the deceased was employed, died upon a Saturday in May, 1915, and was buried on Sunday. On the following evening at about eight o'clock the deceased was in the house of Ferguson, along with Ferguson's family, when some one approached the window, which has been described as looking out into the field, and discharged two loads from a shot gun, through the window, which took effect upon the deceased, who was sitting with his face in the direction of the window. The shots caused his instant death. The next morning tracks of a man, apparently running, were discovered leading from the back of Ferguson's house across the corn field in the direction of where one, Ridner, resided. On the day preceding, a carnival was being held in the town of Trenton, and the Jefferson woman and the sister of appellant went to the carnival from the dwelling house of appellant, and late in the afternoon, appellant, also, went to Trenton and during the night following, he and the Jefferson woman and his sister came from Trenton to his home, at which they arrived at about two o'clock a. m. At about four o'clock a. m., Lula Jefferson left appellant's house and went to the house of one, Harlan, where she remained until the following morning, when she went to the place where Mr. Brockman was a corpse, at which place she arrived at about eight o'clock a. m. She remained there during the day and assisted the wife of Ferguson, who resided there, in preparing the dinner for the people who were there on that occasion, and about four o'clock on that afternoon, she left there and proceeded to the town of Trenton. The deceased was, also, there during the day, but it does not appear that there were any

communications between him and the Jefferson woman, and he did not accompany her away, but remained there until he was shot and killed, at about eight o'clock on that evening. About six or seven o'clock on that Sunday morning appellant accompanied his sister, who was living with him, to his father's house, which was about three-quarters of a mile from the Brockman place, and after remaining there a very short time, went to the house of his brother about two miles away from the Brockman place, where he secured a horse and rode through Trenton to the place owned by one Dr. Dickinson, where he spent the day with a colored man who lived there and from there he returned, late in the afternoon, to the place from which he had obtained the horse in the morning, where he left the horse and went to his own home, and from there to the house of one Dave Allen, at which place he arrived at about seven-thirty p. m., where he remained until eight or nine o'clock and then, according to his statement, returned to his own home, and as he claims, did not know of the death of the deceased until in the forenoon of the next day, when a justice of the peace came and arrested him and took him to the place where the body of the deceased was. He was required to fit his shoe in the tracks, which ran from the window of Ferguson's house across the corn-field, but it was found that his shoe failed to fit the tracks, and in fact were too large to have made the tracks. It, also, appears, that Ferguson's shoes fit the tracks which were found in the corn-field. The woman, Lula Jefferson, testified, that on the occasion of the altercation between appellant and deceased at Hatcher's Springs, about eight months before the death of the deceased, that the appellant charged deceased with attempting to take the Jefferson woman away from him, which the deceased denied; that appellant struck at deceased and, also, snapped a pistol at him, and threatened to kill him if he bothered with the Jefferson woman. The brother of deceased, who was present on this occasion, does not corroborate the Jefferson woman in the fact that appellant attempted to strike or shoot deceased or had a pistol or threatened to kill him upon that occasion, but says that he approached appellant and stated to him that he had received information that he had threatened to kill the deceased, but that appellant replied that he had not done so, and that all he

wanted was for the deceased to let the Jefferson woman alone. The Jefferson woman, also, testified that the appellant beat her very frequently, and that was the cause of her ceasing to live with him, and that on the Saturday night preceding the Sunday night upon which deceased was killed, appellant came to Trenton and accompanied her and his sister back to their home, and after arriving there beat her and said that the reason that she had not returned earlier from Trenton was that she was there with the deceased. She further testified that about four weeks preceding that occasion the appellant said that if it was the last thing that he did upon earth, that he would kill the deceased, if he undertook to keep company with the Jefferson woman. She further testified that when she abandoned appellant about four o'clock on the morning of the day upon which deceased was killed, appellant said to her that she could leave him if she wanted to, but that it would not do her any good, that he would kill Clardy and her, too. There was, also, proof by another witness, that about four weeks before the assassination that appellant and deceased were in Trenton and that deceased said to appellant that he heard that he had threatened to kill him, and that if he wanted to do anything of that kind the present was a fair opportunity, but that appellant replied that he had no intention of harming him, if deceased did what he said that he would. The appellant testified that he did not threaten nor attempt any violence upon the deceased upon the occasion at Hatcher's Springs, but merely said to him that he did not want him to be engaging the Jefferson woman in conversation, and deceased thereupon said that if appellant did not desire him to do so, that he would not do so in the future, and that from that time forward that he had no knowledge of deceased attempting any communications with the woman, in any way, and denied all the statements of the Jefferson woman as to threats, which she testified that he had made about the deceased.

It will be observed that the only evidence which, in any way, could connect the appellant with the death of deceased, was the threats which the Jefferson woman proved that he had made to do violence to deceased in the event that deceased should interfere with the relations between him and the woman. There is an entire absence of any other fact or circumstance, which in any

way connects the appellant with the homicide. The deceased is not proven to have given the woman any attention. The appellant is not proven to have been in the neighborhood of where the death occurred. He was not seen either going or coming or about the place where the homicide occurred. He is not proven to have owned any weapon or to have had in his possession any weapon with which it might have been done.

At the close of the evidence offered by the Commonwealth, the appellant moved the court to peremptorily instruct the jury to find a verdict for him, but this motion was overruled, to which he excepted.

The question presented for determination by this court is, whether or not there is any evidence, which connected the accused with the commission of the crime for which he was convicted, and, further, whether there was sufficient evidence to sustain the verdict of the jury. The well known rule to which this court adheres in the trial of criminal prosecutions is, that where there is any evidence which connects the accused with the crime and tends to prove his guilt, the issue of his guilt or innocence should be submitted to the jury for its decision. Commonwealth v. Boaz, 140 Ky. 715; Commonwealth v. Murphy, 109 S. W. 353; Spouse v. Commonwealth, 132 Ky. 269. It has, also, been held, that where no evidence is offered which tends to support the charge, that it is within the province of the trial court to take the case from the jury and to direct its dismissal for want of proof or to direct a verdict for the accused. Commonwealth v. Boaz, supra; Wilkerson v. Commonwealth, 25 R. 780; Commonwealth v. Murphy, supra; Scott v. Commonwealth, 28 R. 911; Abbott v. Commonwealth, 20 R. 727; Phillips v. Commonwealth, 12 R. 410; 14 S. W. 378.

The question to be considered and determined is, whether the proof of a threat by an accused to take the life of another, which is not supported by any fact or circumstance, which would tend to prove the guilt of the accused or to prove any attempt upon his part to carry his threat into execution or any opportunity to do so, is sufficient evidence of the guilt of the accused of the murder of the threatened person, to submit the issue of his guilt or innocence to the determination of the jury. In the prosecution of one accused of a homicide, it is always competent to prove any threat of vio-

lence made by the accused against the deceased, because it is competent evidence to be considered in determining whether the slaying was done with malice, and in cases where homicides have occurred as the result of rencounters, to assist the court in determining which party brought on the rencounter. The threats proved, as made by the appellant, in the case at bar, if true, would be evidence tending to show the state of his mind as regards the deceased, and of a motive for the perpetration of the crime, but it is impossible to see how such evidence, alone, would conduce to prove the actual perpetration of the acts which constitute the crime. The desire and purpose to do a thing is very far from its accomplishment. The appellant may have been the guilty perpetrator of the homicide of which he is accused, and a crime so dastardly is, beyond cavil, worthy of the severest punishment, but it is equally abhorrent, as the crime, to contemplate the visitation of punishment upon one who is not proven to be guilty of the crime with which he is charged. One can not be subjected to the penalties of the criminal law upon mere speculation and suspicion. There must be some tangible evidence of his guilt. The proof of a threat to slay another oftentimes illustrates the acts of an accused, in a way, to connect him irrefutably with the commission of a crime, but, in the case at bar, there are no acts nor circumstances proven against the accused connecting him with the death of the deceased, which the proof of the threats could in any way illustrate. Hence, we conclude that however unfortunate it may be that the Commonwealth is unable to fasten the commission of this crime upon any one, there was no evidence offered which was sufficient to take the case to the jury, as against the accused, and neither was there evidence sufficient to support the verdict which the jury returned.

Hence the judgment of conviction is reversed, and the cause remanded for proceedings consistent with this opinion.