## Howard v. Commonwealth.

(Decided April 22, 1932.)

ERVINE TURNER, R. A. DUNN and LEEBURN ALLEN for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for Commonwealth.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

Appellant, Alf Howard, was indicted by the grand jury of Breathitt county, charged with the murder of Emory Noble, and on trial was convicted of voluntary manslaughter, and his punishment fixed at confinement in the penitentiary for five years.

His motion and grounds for a new trial being overruled, he has appealed, urging through counsel five grounds for the reversal of the judgment, as follows:

(1) The court failed to instruct the jury to find the defendant not guilty at the close of the evidence introduced by the commonwealth.

(2) Because the court permitted the commonwealth over the objections of the defendant, to introduce incompetent evidence, which materially affected the substantial rights of the defendant.

(3) That the verdict was not sustained by the evidence.

(4) The court erred in failing to give the whole law of the case, and failed to properly instruct the jury.

(5) The verdict of the jury was the result of passion and prejudice on the part of the jury, and thereby the defendant did not obtain a fair and impartial trial.

We will not now consider all of these objections, but only Nos. 3 and 5 thereof, complaining that the verdict was not sustained by the evidence and that it was the

result of passion and prejudice on the part of the jury, in that the conclusion we have reached that these objections are meritorious will render unnecessary the present decision of the other questions raised in appellant's motion for a new trial.

The disposition of objections 3 and 5, however, calls for a substantial, if brief, statement of the facts as testified to by the witnesses. Upon a full and thorough examination of this evidence found in the record, the facts are found to be as follows:

On the 23d day of December, 1930, the appellant, Alf Howard, Emory Noble, the deceased, his father, Sylvester Noble, Sam Mullins, Pruda Mullins, Therman Allen, and others were attending a Christmas tree at Laurel Branch schoolhouse in a remote section of Breathitt county.

It is undisputed that Alf Howard and the deceased, Emory Noble, had always been good friends and had there worked together some eight or ten years, and that there had never been any trouble between them.

Upon the occasion in question, it appears that both were drinking, Emory Noble supplying the whisky, while they were attending the Christmas tree festivities. About the time these were over, the appellant, Sylvester Noble, Sam Mullins, and perhaps others, all then friendly with each other, fired shots into the ground, which the witnesses described as being only their way of having a good time.

At this time when the crowd was beginning to disband to go home, the deceased, Emory Noble, had an unprovoked quarrel and fight with Thurman Allen, striking him in the face, when, it appears, the deceased's father, Sylvester Noble, who was present, approached his son Emory, and reprimanded him for starting this trouble with Allen, whereupon the two Nobles, father and son, became engaged in a fight. Emory having struck his father with his fist a couple of blows, and his father having drawn his gun to shoot him, the deceased started for his home to also get a gun, telling his father, it seems, that "he would get his gun and come back and kill him." As Emory left, he came to where appellant was standing, talking with another friend a few steps distant from where Emory and his father had just fought, and which fight it clearly appears the appellant, Howard had heard

and seen. Appellant approached the decedent, as he passed him, and laid his hands on his friend's shoulder, or took hold of his arm, and said, "Emory, listen, to me. That is your old Daddy," or addressed him in words substantially the same as those quoted, or that he, as some witnesses say, told him he "shouldn't shoot his old Daddy, who had raised him, or shouldn't have trouble with his Daddy;" all their testimony being that, in accosting Emory, he approached him in a friendly manner, apparently seeking to dissuade him from carrying out his threatened plan of going for his gun and shooting his father. However, such friendly counsel and interference was not well received by the decedent, who told him to let him go, that it was none of his business, or words to that effect, and being at the time in a fighting mood, as it appears from his two difficulties just then finished with Allen and his father, he proceeded to attack the appellant, grappling with and striking at him.

The evidence is that the appellant was at the time armed with a .45 calibre pistol carried in a holster, while the decedent had only a knife, which he drew. He struck at appellant with his knife and, advancing on and following him, continued to strike at him for some 25 steps or more down the hill, appellant retreating and sidestepping, trying to ward off the knife thrusts. Also by the evidence of his witnesses, it appears that appellant, during this attack, was trying to persuade his friend Emory to stop fighting and to prevent him from cutting him, until, as the witnesses say, "Emory got him foul", that is, had his arm with his knife in his hand around appellant's neck, and that Noble, in reply to appellant's entreaty that he abandon his attack and struggle to injure him, said "when his knife left his neck, his head would leave his body," but when his knife, which he was trying to force into appellant's neck began to sting and when appellant's strength, with which he was holding Noble, began to fail and he felt Noble wearing him down and about to succeed in pressing his knife into his neck, and when Noble's father, Sylvester Noble, was saying he would shoot them loose and was shooting, and Sam Mullins was shooting, during this melee, Howard, they testify, tried to shoot Emory Noble, and it appears did shoot and kill the deceased, his assailant; that the deceased when shot fell to the ground, dragging down

appellant whom he was holding with him. Appellant then took the deceased's arm from around his neck and walked a few steps away, when he turned and came back and stooped over the deceased and lifted and changed the position of the deceased's head as he lay upon the ground, at the time saying, "Old boy, are you killed?"

All of the witnesses testify that, when decedent fell to the ground, a knife fell from his hand, which was seen by them all as the body laid there though not all the witnesses saw the knife in his hand while in combat with appellant.

Prudie Mullins testifies that she was standing near Noble and Howard at the time of their difficulty and saw that Emory Noble, the decedent, was going to kill appellant and that she tried to get Noble's knife away from him. She also testifies that the appellant told her to get the knife from Emory and that he would give her his gun and begged Noble to quit as he didn't want to hurt him and that the appellant, after retreating as far as he could and doing all he could to save his own life without hurting or shooting Noble, a larger and stronger man than he who had just fought his father and, unprovoked, attacked and whipped Clarence Allen and also thrown his hat to the ground at the feet of Prudie Mullins, with the boast that he could "whip any s—— of a b—— there" or in the county, did shoot Noble. Thus did the appellant, as is shown by the evidence, while held in the grip of and contending with this drunken, bloodthirsty and dangerous man, finally force upward his gun and shoot him in the desperate effort to save his life, or to prevent the deceased from carrying out his braggart threat of cutting his head from his body.

Appellant contends that the verdict of the jury, finding him guilty of voluntary manslaughter upon such evidence, is flagrantly against the evidence, and the result of passion and prejudice, and that his motion upon these grounds for a new trial should have been sustained.

The commonwealth introduced three witnesses, Mrs. Lula Clemons, Martin Clemons, and Frank Lovins, all of whom gave substantially the same testimony, that the appellant, the decedent, Sam Mullins, Sylvester Noble, and the others there at the Christmas tree celebration had been and were at that time all friends and having a good time; that the appellant and others of his friends

upon the conclusion of the Christmas tree program, on leaving the schoolhouse fired their guns into the ground; that the decedent then whipped Allen, and was, it appears, reprimanded by his father, whom he also fought, and was leaving to get his pistol when he passed the appellant standing a few feet away, when, each of these three witnesses state, the appellant addressed him in a friendly manner, saying, ''Listen to me, Emory,'' and laid his hand upon his shoulder or took hold of his arm, when the wrath of Emory broke loose upon the appellant. He attacked him and continued to advance and strike at him, and to struggle in locked combat, with him even though Howard backed away and tried to retreat, until finally he shot the deceased. These witnesses say that appellant struck the deceased on the side of the head with his pistol, but all of them say this was done after appellant had become engaged in combat with him. No one of these witnesses testified that the appellant on this occasion started the trouble or attacked Noble, or did anything to provoke Emory's attack, but had only said, ''Listen to me, Emory,'' while he laid his hand upon his shoulder or took hold of his arm to talk with him.

Such words and conduct are not those employed by an assailant, nor sufficient to justify the decedent in turning these words of counsel or persuasion of the appellant into a provocation for his attack.

Neither do any of the witnesses state that the appellant used his gun against his friend Emory Noble, the deceased, this larger and stronger man, until forced by the situation of peril to do so, or until after he had retreated a distance and had attempted to avoid injury by retreating and begging him to desist from his attack. Such is not the conduct of a man armed with a .45 caliber pistol who wished to kill another, especially when that other was pressing and attacking him with a knife, but rather evidences the reluctance of one who would shoot only in his necessary self-defense. The evidence herein, even of the commonwealth's witnesses, is to the effect as stated, though a larger number or seven witnesses testified for the defendant that he was attacked by the decedent, when he was trying to dissaude him from going for his gun to shoot his father, as then threatened by him. They all testified too that the appellant avoided

injuring or shooting the decedent as long as he was able to defer acting and yet not lose his life through Emory's carrying out his threat of cutting off his head, upon which desperate purposes the evidence clearly shows he was engaged from the time of Howard's speaking to him.

Upon a careful review and consideration of the evidence herein, we are constrained to conclude that the verdict of guilty of manslaughter returned by the jury was not sustained by the evidence, but was flagrantly and palpably against the evidence to such an extent as to at first blush shock the conscience.

In the case of Partin et al. v. Commonwealth, 197 Ky. 840, 248 S. W. 489, 491, this court said:

"Since the amendment in 1910 (Laws 1910, c. 92) to section 281 of the Criminal Code of Practice, this court has jurisdiction to reverse a judgment of conviction in a criminal case on the ground that it is flagrantly against the evidence, but which authority we have continually held should be sparingly exercised, and not done unless from the entire record it is made patent to a reasonable and impartial mind that the verdict was the result of passion and prejudice on the part of the jury to such an extent as to shock the conscience of the court whose primary duty it is to administrater justice in all cases. Day v. Commonwealth, 197 Ky. 730, 247 S. W. 951 (decided February 16, 1923); Anderson v. Commonwealth, 196 Ky. 30, 244 S. W. 315; Allen v. Commonwealth, 176 Ky. 475, 196 S. W. 160; Polley v. Commonwealth 171 Ky. 307, 188 S. W. 409; Day v. Commonwealth, 173 Ky. 269, 191 S. W. 105; Crews v. Commonwealth, 155 Ky. 122, 159 S. W. 638; Hall v. Commonwealth, 149 Ky. 42, 147 S. W. 764; Edmonds v. Commonwealth, 149 Ky. 242, 147 S. W. 881; and Lucas v. Commonwealth, 147 Ky. 744, 145 S. W. 751."

Also, in the later case of Miracle v. Commonwealth, 228 Ky. 591, 15 S. W. (2d) 429, 430, in its consideration of the evidence there before it as sustaining the conviction had the court said:

"If every fact which the testimony tended to prove be admitted, and the explanation offered by defendant be disregarded, it would not compel the

belief or support the conclusion that appellant was guilty of the crime of which he was accused. It is the province of the jury to weigh the evidence and reconcile conflicting testimony, but when the facts proven do not tend to incriminate, or to establish the connection of the accused with the offense charged, the evidence is not sufficient to sustain a conviction. Wilkerson v. Commonwealth, 76 S. W. 359, 25 Ky. Law Rep. 782; Sprouse v. Commonwealth,132 Ky. 283, 116 S. W. 344; Daniel v. Commonwealth, 170 Ky. 698, 186 S. W. 489.

"Since the amendment of 1910 to section 281 of the Criminal Code, this court is authorized to grant a new trial, when the verdict of the jury is palpably against the evidence and can be accounted for only on the ground of passion or prejudice on the part of the jury against the accused. Brown v. Commonwealth, 226 Ky. 255, 10 S. W. (2d) 820; Watkins v. Commonwealth, 227 Ky. 100, 12 S. W. (2d) 329; Forgy v. Commonwealth, 219 Ky. 177, 292 S. W. 799; Partin v. Commonwealth, 197 Ky. 840, 248 S. W. 489." Also, see, section 271, subsection 5 and section 340, Criminal Code of Practice.

So, influenced by the rule and principle of the law as laid down in these cases and from a thorough and careful consideration of the record, being of the opinion that the verdict of the jury was so flagrantly against the evidence as to induce us to conclude that it was the result of passion and prejudice, we are constrained upon such grounds to reverse the judgment. Therefore, for the reasons stated, the judgment is reversed, with direction to sustain the motion for a new trial and proceedings consistent herewith.