## STOUT *v.* THE STATE OF INDIANA.

[No. 21,565.   Filed June 22, 1910.]

1.   WITNESSES.—*Impeachment.—Collateral Matters.—Cross-Examination.—Evidence.*—Where a witness is asked, on cross-examination, certain collateral and immaterial questions for the purpose of laying ground for an impeachment, the cross-examining party is bound by the witness's answers, and cannot introduce evidence to show that the answers were false.   p. 396.

2.   HOMICIDE.—*Evidence of Commission of, by Another.—Bloodhounds.*—In a prosecution for homicide, an objection by the State to evidence offered by defendant that a certain other person had bought a box of cartridges of the size used in the commission of the murder, and that bloodhounds had trailed to such person's house, should be sustained, there being no promise of other evidence to sustain the accusation against such person.   p. 398.

3.   INDICTMENT.—*Homicide.*—An indictment for murder, charging that defendant purposely, feloniously, and with premeditated malice, killed decedent, is sufficient.   p. 399.

From Allen Circuit Court; *E. O'Rourke,* Judge.

Prosecution by The State of Indiana against John Stout. From a judgment of conviction, defendant appeals. *Reversed.*

*Richard K. Erwin,* for appellant.

*James Bingham,* Attorney-General, *Albert E. Thomas,* Prosecuting Attorney, *Barrett & Morris, James M. Robinson, A. G. Cavins, E. M. White* and *W. H. Thompson,* for the State.

JORDAN, J.—Appellant, John Stout, was indicted by the grand jury of Allen county, Indiana, for the murder of Columbus Croy, the marshal of the town of Woodburn, Allen county, Indiana, who appears to have been killed at said town on June 7, 1907. The first count of the indictment charges that appellant purposely, feloniously and with premeditated malice killed said Croy. The second and third counts charge the crime to have been committed by appellant while engaged in perpetrating the crime of burglary.

After unsuccessfully moving to quash each count of the indictment, appellant entered a plea of not guilty. He was tried by a jury, and a verdict returned finding him guilty, as charged, of murder in the first degree, and fixing his punishment at imprisonment in the state prison during life. Judgment was rendered on the verdict. From this judgment he appeals, and the alleged errors upon which he relies for reversal arise out of the ruling of the court in denying his motion to quash the indictment and overruling his original motion and a supplemental motion for a new trial.

The crime of which appellant was charged and convicted is the same as that which was involved in the appeal of *Miller* v. *State* (1910), *ante*, 255. The evidence given on the trial in many respects is similar to that in the latter case, in the main the same questions are presented, and the decision therein must rule in the determination of this appeal.

Fred A. LaDuke, an accomplice in the commission of the murder of Croy, was the principal witness against appellant, and the evidence given by him is substantially the same as that which he gave in the case of *Miller* v. *State, supra.* He testified that he, together with John Baker, Herman Miller and appellant, broke into the saloon operated by Joe Faulkner in the town of Woodburn, and that Croy was shot while witness and his associates were engaged in robbing this saloon. The evidence introduced by the State on the trial is in part positive and in part circumstantial. The evidence in the case is quite conflicting.

Mrs. Louisa Miller whose husband, Herman Miller, as shown by the testimony of LaDuke, was a party in the commission of the crime—was introduced as a witness in behalf of appellant. Her evidence went to show that at the time the burglary and murder were committed, as stated by LaDuke, her husband was at home in bed. On cross-examination by the State, over the objections and exceptions of appellant, the State was per-

mitted to ask Mrs. Miller, apparently for the purpose of laying the foundation to impeach her, whether, (1) if about ten days after the murder of Croy she did not say to Lena Jergins that her husband, Herman Miller, was sick, "that he thought they were trying to push the crime onto him, and that it made him sick to have the murder talked about;" (2) if she did not, after the murder of Croy, at the home of the latter, while viewing his dead body, take some embalming fluid and pour it into the open lips of the corpse and laughingly say: "Let's give him a drink, it will do him good;" (3) if, in a conversation with a party named, after the murder of Croy, she did not say that her husband, Herman Miller, "could not bear to have any one talk in front of him about the Croy murder, that it made him so nervous;" (4) if she did not say on the first day after the death of decedent, to certain persons mentioned, that "since this happened [meaning the murder] I told Herman [her husband] where his three big guns were."

To each of the questions this witness responded in the negative. Notwithstanding this fact, the court permitted the State, over the objections of appellant, to call certain witnesses and contradict her. The matters sought to be elicited by these questions were immaterial, and not in any manner inconsistent with or contradictory of her testimony given in court. Under the circumstances, the State was bound by her negative answer, and the court, in allowing it to introduce witnesses to contradict her, erred to the prejudice of appellant. Two of these impeaching questions were considered and condemned as erroneous in the case of *Miller* v. *State, supra.*

It appears from the evidence that after the commission of the murder in question a bullet was found imbedded in an ice-house situated across the street from the Faulk-

2. ner saloon into which appellant and his associates are charged to have broken on the night in question.

This bullet was shown to be a .44-caliber ball. For the purpose of showing that a man by the name of Bennett, who resided near Woodburn, had committed the murder in question instead of appellant, the latter offered to prove by Jacob Myers, a hardware merchant of Woodburn, that at some time prior to the murder he had sold said Bennett a box of .44-caliber shells. It had been previously shown that the sheriff of the county on the day after the murder had procured bloodhounds for the purpose of trailing the perpetrators of the offense, and that in trailing these hounds had run up to said Bennett's house. The State objected to this offer to prove, and its objections were sustained by the court. This ruling appellant claims was erroneous. It is true that a person charged with the commission of an offense may, upon the trial, be permitted to show, if he can by legitimate evidence, that some particularly designated person or persons committed the crime charged, instead of himself. *Jones* v. *State* (1878), 64 Ind. 473; *Green* v. *State* (1900), 154 Ind. 655, and authorities cited.

It is certainly plain that the evidence embraced in this offer to prove, standing alone, did not tend to show that Bennett was in any manner connected with the murder of decedent. There was no offer or promise upon the part of counsel for appellant that they would follow the evidence offered with other facts or circumstances tending to show that Bennett, instead of appellant, was guilty of the commission of the offense. Standing by itself, we perceive nothing in the evidence offered which would tend to prove that Bennett was, or that appellant was not guilty of the murder of Croy.

The competency of evidence in a criminal case, which shows the trailing of the accused person by bloodhounds, may be said to be a debatable question, and one depending on the character of such animals, their experience and training, and the conditions and circumstances in each particular case. In regard to the competency of such evidence, it

may be said that the authorities ''fight on both sides'' of the question. For the cases holding that such evidence, under certain circumstances and conditions, is admissible, and for those holding to the contrary, see the cases collected in 5 Wigmore, Evidence p. 22. See, also, 12 Cyc. 393; *Sprouse* v. *Commonwealth* (1909), 132 Ky. 269, 116 S. W. 344; *State* v. *Spivey* (1909), 151 N. C. 676, 65 S. E. 995; *Brott* v. *State* (1903), 70 Neb. 395, 97 N. W. 593, 63 L. R. A. 789.

In the latter case the court, in denying the competency of such evidence, said: ''The bloodhound is, we admit, frequently right in his conclusions, but that he is as frequently wrong, is a fact well attested by experience. * * * It is unsafe evidence, and both reason and instinct condemn it.'' The question of the admissibility of such evidence in our jurisdiction has never been decided, but is still open to be determined in the future when properly presented. The court did not err in rejecting the evidence which appellant offered to introduce.

The sufficiency of each count of the indictment is assailed by appellant, but the pleading is sufficient, and appellant's motion to quash was properly overruled.

3. Other questions are discussed, but as these possibly may not arise again, we pass them without consideration.

For the errors of the court, which we have pointed out, the judgment is reversed, with instructions to the lower court to grant appellant a new trial.