(No. 15740.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. ISABELLA NITTI et al. Plaintiffs in Error.

*Opinion filed April 14, 1924.*

1. CRIMINAL LAW—*constitutional and statutory provisions intend that accused shall have competent counsel.* The provision of the constitution that an accused person shall have the right to be represented by counsel, and the statutory provision pursuant thereto that if the accused is unable to procure counsel "the court shall assign him competent counsel, who shall conduct his defense," intend that only persons qualified by learning, intellectual capacity and good moral character shall be permitted to defend in a court of justice the life or liberty of a person charged with crime.

2. SAME—*competency of counsel may be considered in determining whether defendant was legally convicted.* The fact that the accused is poorly defended will not justify the reversal of a judgment where it is reasonably supported by satisfactory evidence, but it is proper to take such fact into consideration in determining whether the accused has been legally convicted of a capital offense.

3. SAME—*any evidence, if not too remote, tending to show that another committed the crime is relevant.* One accused of crime may prove any fact or circumstance tending to show that the crime was committed by another person than himself, but if it is too remote in time to throw light on the fact to be found it should be excluded.

4. SAME—*what evidence is admissible as tending to prove another committed the crime.* In a trial of a wife for the murder of her husband, who mysteriously disappeared from the home, evidence that her son had a quarrel with his father two weeks before he disappeared and that the son disappeared the same night as the father and was gone for a week is relevant and admissible when offered in proper form.

5. SAME—*general rule as to when an admission is implied from silence.* An admission may be implied from the conduct of a person charged with crime who remains silent when one states in his hearing that he was concerned in the commission of the crime, provided the statement is made under circumstances which allow an opportunity for him to reply and where a person similarly situated would ordinarily deny the imputation.

6. SAME—*admission implied from silence has more weight when accusing statement is made directly to defendant.* Where the de-

fendant is openly and directly accused of having been connected with the crime charged or a question is distinctly and directly put to him, the imputation of guilt arising from his silence is much stronger than where the statement implicating the accused is made to other persons in his presence.

7. SAME—*silence of accused, to be regarded as an admission, must be of affirmative nature.* To constitute an admission of guilt, silence of the accused when a statement implicating him is made in his presence must be of an affirmative nature,—that is, it ought to appear that he heard the statement and voluntarily refused to challenge it.

8. SAME—*principle upon which statements in presence of accused are received in evidence.* Statements made in the presence of the accused, implicating him, are received in evidence, not as proof of the fact stated but to give meaning to the reply of the accused or to his conduct in remaining silent when he would naturally be expected to deny the accusations.

9. SAME—*accusing statements in presence of defendant should be received with caution.* Statements made in the presence of the defendant implicating him with the crime, and to which he made no reply, should be received with great caution, and it must plainly appear that the statements were heard and understood and that the accused not only had an opportunity to speak for himself, but was in a situation where it would have been fit and proper for him to speak, or where he would have been likely, according to common experience, to deny the imputation of guilt.

10. SAME—*admission implied from silence is not a confession.* A confession is a direct acknowledgment of guilt on the part of the accused, either by a statement of the details of the crime or an admission of the ultimate fact, but an admission implied from the silence of the accused when statements implicating him are made in his presence is not a confession.

11. SAME—*an admission is not, alone, sufficient to convict.* An admission, in criminal law, is a statement of the accused of a fact or facts pertinent to the issue, and tending, in connection with proof of other facts, to prove his guilt; but an admission is not, alone, sufficient to authorize a conviction.

12. SAME—*admission implied from silence is to be weighed with other facts—instructions.* Silence at the time one is accused of crime may constitute conduct from which guilt may be inferred, but such silence can never have the legal effect of a confession; and while the court may instruct the jury as to the conclusive character of a confession, an instruction as to an admission, implied from silence under an accusation, must be only as to its weight as a circumstance, with other proof, to establish the fact stated.

13. SAME—*when statements in presence of accused are not admissible.* Statements made in the presence of the accused implicating him with a crime are never admissible where he unequivocally denies their truth, nor are they admissible where by his conduct or by a statement made by him the accused shows clearly that he does not acquiesce in the statements.

14. SAME—*the constitution guarantees to an accused person the privilege of silence.* Both the Federal and State constitutions guarantee to every person accused of crime the privilege of silence, and the failure of an accused to testify cannot create any presumption against him, nor is the prosecution permitted, under the Criminal Code, to comment on the fact that the accused has not testified.

15. SAME—*when exclamations of accused at time of arrest are not admissions of guilt.* Where a defendant, an ignorant foreign woman who had been arrested for the murder of her husband and kept in custody for several weeks until discharged because the State was unable to prove the *corpus delicti,* is arrested a second time some months later, after the finding of a body claimed by the State to be that of her husband, her exclamations to the effect that she would be locked up a long time and would never see her little girl again are not necessarily admissions of guilt.

16. SAME—*when judgment may be reversed for want of instructions as to value of certain evidence.* It is not the duty of the court to prepare instructions, but where there is great probability that the accused has been illegally condemned to death by the jury because it misapplied the law in weighing certain evidence, due to failure of counsel to prepare proper instructions, the Supreme Court may reverse the judgment and remand the cause for trial by another jury.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH B. DAVID, Judge, presiding.

DE STEFANO & MIRABELLA, NUNCIO BONNELLI, ALBERT N. GUALANO, FRANCIS B. ALLEGRETTI, and HELEN M. CIRESE, (ROCCO DE STEFANO, and THOMAS E. SWANSON, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

At the May term, 1923, of the criminal court of Cook county, Isabella Nitti, Peter Crudelle and Charles Nitti were charged by indictment with the murder of Frank Nitti. The three defendants were placed on trial under their several pleas of not guilty. At the close of all the evidence the State's attorney, at the request of the court, *nolle prossed* the case against Charles. Isabella and Peter were found guilty and their punishment fixed at death. Motions for a new trial and in arrest of judgment were made and overruled. Attorneys appearing in this court for plaintiffs in error were substituted for the attorney who had appeared for the defendants in the trial court. The attorneys substituted filed a motion to vacate the judgments and the orders overruling the motions for new trial and in arrest of judgment and supported this motion by affidavits. This motion was overruled and judgments were entered on the verdicts. This writ of error is prosecuted to review those judgments.

Frank Nitti, an Italian truck farmer, leased and operated a small tract of land near Stickney, in Cook county. July 29, 1922, he disappeared from his home. May 9, 1923, a body, identified as his, was found in a catch-basin in Stickney. When the body was found it was badly decayed. There was no flesh on the face and front of the body from the waist up. There was very little flesh on the back of the neck and body above the waist. The lower half of the body was in a better state of preservation, and the trousers and shoes were still intact. The bones of the left hand had fallen apart and were found at the bottom of the catch-basin. On one of these bones was a ring, which was identified by three persons as a ring which Frank Nitti had worn for some time before he disappeared. There was a shoe on the left foot of the body and another shoe was found in the catch-basin,

and these were identified by one witness as the shoes worn by Frank on the day he disappeared. The skull of the body was fractured, the shape of the fracture indicating that it had been caused by a blunt, octagonal instrument about one and a quarter inches in diameter. Isabella Nitti was the wife of Frank, Charles was his son, and Crudelle was a farmhand who was employed by Frank and who boarded and roomed with the Nitti family. The three were arrested for the murder of Frank about six weeks after his disappearance, were kept in custody for several weeks, and were finally discharged because the State was unable to prove the *corpus delicti.*

Mike Travaglio testified that he saw Frank selling vegetables at the Randolph street market, in Chicago, about seven o'clock Saturday morning, July 29, 1922; that he had not seen him alive since that time; that he saw his body at an undertaking establishment in Berwyn on May 10, 1923; that he identified the body by the two shoes and the ring found with it; that in April, 1922, he was employed by Frank; that he requested Frank to buy a pair of shoes for him; that Frank bought a pair of tan shoes and gave them to him; that he wore them two or three days, but as they were too large for him he gave them to Frank; that Frank wore them from that time until he disappeared, three months later; that he had the shoes on when he saw him at the market the morning of the day he disappeared; that the shoes were ordinary tan lace shoes and had no mark to distinguish them from other tan lace shoes; that the morning he saw Frank at the market he saw on his finger the ring which was found with the dead body; that the ring was one formerly owned by James Nitti, one of Frank's sons; that when James wore the ring it was set with a red stone; that James wore it until the set was broken; that thereafter the prongs were pounded down with a hammer and Frank wore it; that he had seen many rings like this one was when it was new.

James Nitti testified that he lived in Wisconsin and that he had not seen his father for about a year before he disappeared; that he saw the body which was found in the catch-basin and identified it as that of his father by the ring which was found on the bone of one of the fingers; that the ring formerly belonged to him and that at the time he wore it it was set with a red stone; that he broke the stone and threw the ring in the front yard; that his father got the ring, flattened the prongs and thereafter wore it; that he was at his mother's house, in Cicero, when the deputy sheriff came to arrest her and Crudelle; that when the deputy came into the house she said, "James, we got your father; now it is sure I won't come out no more;" that she clasped her little girl in her arms, kissed her, and said, "My dear daughter, now I won't see you any more forever; the last time I see you is to-day;" that then she fainted; that Crudelle was present and said nothing; that witness was present at the State's attorney's office about the middle of September, 1922, when his mother, his brother Charles, and Crudelle, were there under arrest for the murder; that two assistant State's attorneys, a private attorney hired by him to assist the State's attorney, his brother Mike, deputy sheriff Dasso, who made the arrest, and other persons, were there; that the interview was conducted in both the English and the Italian languages; that assistant State's attorney Romano, who spoke Italian, asked Charles in Italian, "Who killed your father?" and that Charles replied, "My mother and Peter Crudelle;" that Romano then asked Mrs. Nitti, "Did you kill your husband?" and that she replied, "Whatever Charlie said, that is true;" that Charles was directed by Romano to tell the whole story; that Charles said his father was asleep under a wagon and that Pete got a hammer and walked toward his father; that he pushed Pete to prevent him from hitting his father and that Pete dropped the hammer; that his mother handed the hammer to Pete and that Pete struck his father on the head; that Pete and

his mother pulled his father from under the wagon and dumped him into it; that they hitched a horse to the wagon and hauled the body to the drainage canal and dumped it in. On cross-examination James testified that he had employed private counsel to assist in the prosecution and had paid him $700; that the $700 had been collected by James Volpe; that his mother was in jail about three months the first time she was under arrest; that while she was in jail he applied for letters of administration in his father's estate; that his brother Mike was with him; that he knew nothing of any trouble between Mike and his father; that he had heard nothing about it and had made no inquiry about it; that on the morning of May 5, four days before the body was found in the catch-basin, his mother in a private conversation with him said, "If you want to see your father go in the cornfield;" that there had been no talk about his father before she made this remark and that he did not know why she made the statement to him; that he told her not to talk like that; that when the interview was held in the State's attorney's office ten or twelve people were present; that Charles spoke in English and Italian; that his mother does not speak or understand any English and Crudelle speaks and understands little English; that Romano talked with Charles in English; that after he had talked to him, Romano said to witness' mother, in Italian, what is equivalent to, "Did you kill your husband?" and that she replied, "Come parle."

Edward H. Hatton, coroner's physician, testified that he examined the body which was found in the catch-basin; that the body was clothed from the waist down with trousers and underclothes and that there were a shoe and a sock on the left foot; that the upper part of the body was badly decomposed and was clothed only in fragments of underclothes; that the flesh had entirely disappeared from the skull, face, neck and chest; that the heavy muscles of the back and shoulders were still attached to the bones; that

there was some hair between the shoulders which was nearly black; that the trousers were in good condition; that there was a depression in the skull in the region of the temple; that there was a huge fracture of the skull, extending back from this depression nearly to the mid-line at the back of the head; that the fracture was three or four inches in length; that there was another fracture running from the depression toward the mid-line at the front of the head; that the bone of the nose was broken and the front teeth were missing; that the bones of the skull were blood-stained and there was an accumulation of clotted blood in the cavity of the skull; that the skeleton appeared to be that of a white man between twenty-five and fifty years of age, five feet four inches tall, weighing about 145 pounds; that in his opinion the injuries were produced by the forcible contact of some hard substance with the skull, the substance having a comparatively flat surface about one and a quarter inches in diameter, either round or octagonal.

David Abram, an undertaker of Berwyn, testified that he, with the assistance of other men, took the body from the catch-basin; that the body was sitting in two and a half feet of water; that in the catch-basin they found a bone with a ring on it; that the ring produced in court was the one found; that the shoes and the trousers produced in court were those found with the body; that the trousers were held about the body by a belt which appeared to be a piece of harness; that the catch-basin where the body was found is located a mile and a quarter from the drainage canal; that the Nitti farm is a short distance south from the catch-basin.

Paul Dasso, a deputy sheriff of Italian parentage who had charge of the investigation of the Nitti murder, testified that he first visited the Nitti farm September 14, 1922, and was there about three-quarters of an hour; that he saw the three defendants; that he went to the farm again the following morning and made a search of the property; that

after the three defendants were arrested in September and after Charles had told him the story of the murder, he took Charles and Crudelle to the farm, had the horse hitched to the wagon, and had Peter drive the horse as Charles directed; that Peter, Charles, one Stritker, and witness, were in the wagon; that while they were driving, Charles, talking partly in English and partly in Italian, said that when they were taking his father's body to the canal the body wàs lying in the wagon with the head toward the seat, and that when they had arrived as close to the canal as they could drive, Crudelle took the body on his back and carried it toward the bridge; that when they reached this point, beyond which they could not drive, Charles, Pete and witness walked toward the bridge; that Charles pointed out a place on the incline and said, "That is where he fell down with the body;" that Crudelle said in English, "Bull shit;" that aside from this remark he made no further comment; that they returned to the farm house and witness took the defendants back to jail; that all of the story told by Charles in Crudelle's presence was in Italian; that among other things Charles said, in the presence of Crudelle, that Crudelle was in the bed-room with his mother at times, and that he overheard Crudelle telling her that he was going to do away with the old man; that before they hitched the horse to the wagon Charles pointed out a hammer and said, in the presence of Crudelle, that that was the hammer Crudelle used in killing his father; that witness picked up the · hammer and had had it in his possession since that time; that in the State's attorney's office, about the middle of September, in the presence of the parties named by James Nitti, and a few newspaper reporters, Charles repeated the story of the killing of his father; that he told about Crudelle taking the hammer and striking his father on the head with it while he lay asleep under the wagon, how the body was put in the wagon and the horse hitched to the wagon and the body hauled to the point near the bridge over the drain-

age canal, and how Crudelle took the body on his back and carried it up the incline to the bridge; that Charles said he did not see the body thrown into the canal but that he heard a splash and that Crudelle came back to the wagon without the body; that while Charles was telling the story Mrs. Nitti was moaning and sobbing and Crudelle was sitting quietly; that Crudelle was asked no questions and made no comment or statement; that when he arrested Mrs. Nitti in May, 1923, she cried and said, "Now I see well I will be locked up forever;" that she said to her little girl, "Good by; I am going to be gone for a long time;" that she threw herself on a bed; that he arrested the three defendants, took them to Chicago and placed them in jail; that he thought Charles knew about his father's disappearance and that he "drummed at him" until he told his story.

Anna Volpe testified on behalf of the People, but it is very difficult to get anything reliable from her testimony. Like Mrs. Nitti she speaks the Bari dialect, and the interpreters had difficulty in understanding her and she had greater difficulty in understanding them. By the use of different interpreters the State finally got her story into the record. She testified that in June, 1922, Crudelle was discharged by Frank Nitti because Nitti had learned that he and Mrs. Nitti were guilty of immoral conduct; that she had a conversation with Mrs. Nitti regarding this matter; that Mrs. Nitti sent her son after Crudelle and gave the son five dollars to give to him; that Mrs. Nitti said she did not want her husband any more; that she was going to kill him with a stone, and that if he did not bring Crudelle back to work on the farm he was to be killed by her and Crudelle; that Mrs. Nitti said Crudelle was her husband and she was going to marry him; that Mrs. Nitti told her to leave, because Crudelle was waiting for her and that she was going to bed with him; that shortly after Nitti disappeared she had a further conversation with Mrs. Nitti, and that Mrs. Nitti said her husband had gone away and

would never come back. Mrs. Volpe identified the ring found in the catch-basin as the ring of Nitti.

Peter Crudelle testified that he was twenty-four years old; that he began working for Frank Nitti in October, 1921; that he left in May, 1922, and returned in July following; that he was working on the farm July 29; that there was company at the house that night; that after the company left he went to bed; that he did not hit Nitti on the head with a hammer and that he did not carry his body to the drainage canal and throw it in; that he had never seen the hammer produced in court and that it was not one that had been used on the Nitti farm.

Charles Nitti testified that he was seventeen years of age; that the last time he saw his father was July 29, 1922; that that night his father disappeared, and that he did not know where he went.

Isabella Nitti testified that she was arrested September 14, 1922, for the murder of her husband; that she was in jail two months and twenty-five days; that she was in the State's attorney's office in September, 1922; that there was a big crowd there and that Charles talked; that she had her baby in her arms; that there were so many people talking in Italian and in English that she did not understand what was said; that they asked her if she was an Italian, and she said she was; that she never said that what Charles said was right; that the hammer which was produced in court was the property of James Volpe; that it had never been at their farm; that about nine o'clock Saturday night, July 29, her husband told her to take the children and go to bed, and that he was going out to the oat field to see that somebody did not burn the oats; that she did not see Crudelle strike her husband on the head with a hammer, and that she would have killed Crudelle if she had seen him do it; that neither she nor Crudelle hit her husband with a hammer; that she did not know whether her husband was dead; that she waited nine months for him to

re-appear and then married Crudelle; that she was not intimate with Crudelle before her husband's disappearance or before her marriage to him; that Anna Volpe had always made trouble at her house and that her testimony regarding conversations with witness was not true; that when she arose on the morning of July 30 she could not find her husband; that she sent for her son Mike to help find her husband and that Mike did not report for a week; that Monday morning she went to report to the police that her husband could not be found; that James Volpe suggested to her husband that she was intimate with Crudelle and that her husband became angry at Volpe; that she had her husband discharge Crudelle because she did not want such talk; that later she had her husband re-employ him because he was a good worker and her sons were such bums they would not work; that the ring in evidence was not her husband's ring and that her husband had never worn a ring in America.

James Volpe was called in rebuttal, and testified that the hammer in evidence was not his hammer but was a hammer which he had seen on the Nitti farm.

The attorney who represented defendants in the trial court seemed to be unfamiliar with the simplest rules of evidence and incapable of comprehending the rules when suggested to him by the trial court. A few quotations from the record will demonstrate his ignorance and stupidity. In his cross-examination of the first witness the following occurred:

Q. "Have you got any interest in this case?

A. "Yes.

Q. "What interest have you got?

A. "Because that was a good man and what they kill him for?

Q. "Who killed him?

A. "The way I heard that——

Q. "The way you heard? Who told you?

A. "Charlie told me; Charlie told——"

The court stopped the examination and told counsel that such evidence was not competent. Later, counsel repeated the offense, and the court sent the jury from the room and the following colloquy took place:

The court: "You are asking a lot of questions here that are highly improper and detrimental to your client,— that are not competent. * * * You must stop calling for hearsay testimony unless you insist on doing it, because such evidence is detrimental to your client and you ought not to bring it out. I ought not tell you how to try your case.

Attorney: "Your honor, I have got my case pretty well in hand.

The court: "This court cannot stand by and permit you constantly to ask questions that are detrimental to your clients. You must stop it. * * *

The court: "If you are going to insist that you are going to bring out evidence of this kind I shall have to ask some lawyer to step in here and assist you in the defense. Now, I am telling you because the court will not stand by and allow a person where a life is at stake——

Attorney: "Your honor, I think I have practiced law long enough to know how to try a case, and——"

When James Nitti began to tell of the conference in the State's attorney's office counsel indulged in some meaningless comment, and the court said, "Is it understood that you are making the objection?

Attorney: "Yes, sir; I am objecting to this testimony.

The court: "Now, then, what is the ground of your objection?

Attorney: "The constitution says that the accused shall be confronted with living witnesses in a prosecution. Now, this matter that took place before the State's attorney was not a prosecution. This is some sort of an investigation, and it was illegal, held where the defendants had requested the presence of their counsel. They were not advised of

their rights, and this boy, Charlie, was a minor at the time. If he was at the same age as he was then, your honor, he would be over in a juvenile court.

The court: "I don't know just exactly what you mean.

Attorney: "I mean that the whole proceeding is illegal.

The court: "Objection is overruled. I don't know what you are talking about.

Attorney: "Just as I say, your honor; I cannot state it more plainly. It was a system of sweating."

The witness proceeded with his testimony as to the statement made by Charles, and the court of its own motion stopped the examination and discharged the jury for the day. The court then explained to the attorney for the defense that the State was introducing a confession of one of the defendants made in the presence of the other two defendants, and suggested to the attorney that he should ascertain whether the confession was voluntary and the circumstances under which it was made. The attorney made some meaningless comment which showed clearly that he did not know how to protect the interests of his clients, and the court delivered to him a lecture on the law of confessions, covering eight pages of the abstract. The entire lecture seems to have fallen on stony ground, because the next morning the attorney had not asked more than two dozen questions before the following took place:

Q. "James, do you love your mother?

The witness: "You ask me if I love her? I do not.

Q. "Why don't you love her?

A. "I won't love her.

Q. "Why?

A. "Because she killed my father; that is the reason why.

Q. "You don't know that of your own knowledge?

A. "Yes, sir; absolutely.

Q. "How do you know it absolutely?

A. "Charlie will testify, and that is fair enough.

The court: "I think I will have to stop this unless you insist upon this. Do you insist upon having that answer stand?

Attorney: "It may stand, all right."

A little later the following occurred:

The witness: "I am not on friendly terms with Peter.

Attorney: "Peter never did you any harm?

The court: "Now, listen. I am not going to permit you to ask questions of that kind. You are calling for the witness' conclusion. I don't think it a proper line of examination to ask this man whether this man who is a defendant charged with killing his father ever did him any harm. You are giving this witness an opportunity. If you wish I will let it be answered, but I don't think you ought to ask that question.

Attorney: "The purpose in my mind is——

The court: "Do you wish it answered?

Attorney: "I have asked it; yes.

The witness: "He killed my father.

Q. "You don't know he killed your father?

A. "Absolutely.

Q. "Except what somebody said?

A. "My brother Charlie testified.

Q. "How old was Charlie when he was testifying?

A. "Seventeen years old.

The court: "Do you wish these answers to stand?

Attorney: "Yes."

There were many extended colloquies between the court and counsel, and finally counsel seemed to understand that the court was questioning his ability to properly represent the defendants, and said: "You seem to think I don't know my case, but I do know more about this case than any other man in Cook county."

During the cross-examination of Mrs. Nitti the following occurred:

Q. "Do you know whether or not Charlie was there that night?

A. "I don't remember well. Charlie would always go like that night. He was never in, night or day.

Q. "Was Charlie a bad boy?

Attorney for defense: "He must be bad when he is indicted for murder."

There is no plausible explanation of such conduct on the part of an attorney who pretends to be representing persons charged with crime, if the attorney is of sound mind. The whole case against defendants is dependent upon the statement which Charles made to the officers. Notwithstanding that, the complete direct examination of Charles on the subject was as follows:

Q. "You are one of the defendants in this case?

A. "Yes.

Q. "You are on trial here?

A. "Yes.

Q. "You have heard certain witnesses make certain statements that you said certain things?

A. "Yes.

Q. "Did you say certain things? (Objection to question sustained.)

Q. "Under what circumstances, Charlie, did you say such things? (Objection to question sustained.)

Q. "Do you know where your father is now, Charlie?

A. "No, sir; I do not."

A layman of ordinary intelligence would have conducted a much better direct examination of this witness. Both Federal and State constitutions provide that an accused person shall have the right to be represented by counsel when called to answer a criminal charge, and the legislature has further provided that if the accused is unable to procure counsel, "the court shall assign him competent counsel, who shall conduct his defense." These provisions are not mere empty formalities. (*North* v. *People,* 139 Ill.

81.)   It is intended that only persons qualified by learning, intellectual capacity and good moral character shall be permitted to defend in a court of justice the life or liberty of a person charged with crime.   The fact that the accused is poorly defended will not justify the reversal of a judgment where it is reasonably supported by satisfactory evidence, (*People* v. *Gardiner,* 303 Ill. 204,) but it is proper to take such fact into consideration in a case of this character in determining whether the accused has been legally convicted.   At the time the attorney appeared for these defendants he held a license from this court which certified to the public that he was competent to properly represent any client who might employ him, and any person employing him had a right to rely upon that certificate.   The fact that the defendants were ignorant, illiterate foreigners, unacquainted with law or court procedure in this or any other country, and unable to speak and understand the English language, requires that we take into consideration the gross incompetency and stupidity of counsel appearing for them. We have called attention to but little of the incompetent testimony which was put into this record by the absurd cross-examination of witnesses by the attorney appearing for the defendants.   It is quite clear from an examination of the record that defendants' interests would have been much better served with no counsel at all than with the one they had.

During the examination of Crudelle there was an effort to show that Mike Nitti had had trouble with his father a short time before his father's disappearance, and that Mike disappeared the same night his father did and was gone for a week, the purpose being to show that he killed his father, if he was, in fact, dead.   Objections to the questions were sustained.   In support of the motion to set aside the judgment Mike Desant stated in an affidavit that he was employed on the Nitti farm in the summer of 1922; that about nine o'clock P. M. on or about July 15, 1922, he heard

an argument between Frank Nitti and his son Mike; that Mike demanded $500 of his father, who refused to give it to him; that Mike knocked his father down, kicked and beat him about the face and body, rendering him nearly unconscious; that Frank stood up, holding his stomach, crying, "You have got me!" and that his face, nose and lips were bleeding and swollen. One accused of crime may prove any fact or circumstance tending to show that the crime was committed by another person than himself. (*Synon* v. *People,* 188 Ill. 609; *People* v. *Mitchell,* 100 Cal. 328, 34 Pac. 698; *Green* v. *State,* 154 Ind. 655, 57 N. E. 637.) It is, of course, difficult, in dealing with evidence of this character, to define the precise limits which must control its admission. If it is too remote in time to throw light on the fact to be found it should be excluded. (*People* v. *Pezutto,* 255 Ill. 583; *Stout* v. *State,* 174 Ind. 395, 92 N. E. 161.) The trouble between Mike and his father occurred just two weeks before his father disappeared, and the evidence shows that Mike disappeared the same night and was gone for a week. This evidence was relevant and should have been admitted. The offer was not made in proper form, but under the circumstances we cannot hold that that cures the error. It is significant that Mike did not testify on the trial.

These convictions rest solely upon the assumption that plaintiffs in error confessed the killing by failing to deny their guilt when Charles implicated them by the story he told in their presence. It is settled by many decisions of this court that an admission may be implied from the conduct of a party charged with crime who remains silent when one states in his hearing that he was concerned in the commission of the crime, when the statement is made under circumstances which allow an opportunity to him to reply and where a man similarly situated would ordinarily deny the imputation. (*People* v. *Tielke,* 259 Ill. 88; *People* v. *Seff,* 296 id. 120; *People* v. *Cardinelli,* 297 id. 116; *Peo-*

*ple* v. *Paisley,* 299 id. 576; *People* v. *Andrae,* 305 id. 530.)
If the question is distinctly and directly put to the accused
whether he was concerned in the commission of the crime,
or if he is openly and directly accused of having been so
concerned, then the imputation of guilt is much stronger
than where the statement implicating the accused is made
to other persons in the presence of the accused.   In order
to attach much significance to the failure to reply to the
accusing statement it ought to appear that the silence is
affirmative,—that is, that the accused has heard the state-
ment implicating him and has voluntarily refused to chal-
lenge the statement.   (Burrill on Circumstantial Evidence,
part 2, chap. 1, sec. 24; 1 Elliott on Evidence, sec. 230;
1 Greenleaf on Evidence, sec. 197; Taylor on Evidence,
sec. 809.)   The principle upon which statements made in
the presence of one accused of crime are admitted in evi-
dence against him is, that his silence, when he might and
naturally would deny the accusations of guilt if they were
not true, is regarded as an acquiescence in their truth and
an implied admission of guilt.   In order for the acquiescence
to have the effect of an admission it must exhibit some act
of the mind and show that the accused purposely remained
silent.   It must plainly appear that the language was heard
and understood before the assumption can arise that the
accused adopted the statement as his own.   Furthermore,
it must appear that the accused not only had an opportunity
to speak for himself but was in a situation where it would
have been fit, suitable and proper for him to speak, or where
he would have been likely, according to common experience,
to deny the imputation of guilt.   The liability of misap-
prehension or misrecollection or misrepresentation is such
that the authorities have uniformly held that this character
of evidence should be received with great caution.   (*Ack-
erson* v. *People,* 124 Ill. 563; *People* v. *Pfanschmidt,* 262
id. 411; *O'Hearn* v. *State,* 79 Neb. 513, 113 N. W. 130;
*Phelan* v. *State,* 114 Tenn. 483, 88 S. W. 1040; *Godwin*

*v. State,* 1 Boyce, 173, 74 Atl. 1101.) Since the demeanor of a person upon hearing himself charged with crime is liable to great misconstruction, evidence of this description ought to be regarded with care. In discussing this question courts often say that silence, under the circumstances, may be construed as an admission or a confession. Because of this loose phraseology confusion has arisen, and the circumstances arising from the conduct of the accused in remaining silent is often treated as though it were a confession. This is clearly an erroneous view. A confession is a direct acknowledgment of guilt on the part of the accused, either by a statement of the details of the crime or an admission of the ultimate fact. By the very force of the definition of a confession an admission is excluded. An admission, as applied in criminal law, is a statement by the accused of a fact or facts pertinent to the issue, and tending, in connection with proof of other facts, to prove his guilt. Of itself an admission is never sufficient to authorize a conviction. The principle of confessions has no application to admissions. Under the law the court may instruct the jury as to the conclusive character of a confession, but as to an admission the instruction must be as to its weight as a circumstance, with other proof. So silence under an accusation of crime may constitute conduct or circumstance from which guilt may be inferred, but such silence can never have the legal effect of a confession of a crime. (2 Wharton on Crim. Evidence,—10th ed.— sec. 678a; *State* v. *Major,* 70 S. C. 387, 50 S. E. 13; *Thomas* v. *State,* 143 Ga. 268, 84 S. E. 587.) Such statements made in the presence of the accused are received in evidence, not as proof of the fact stated but to give meaning to the reply of the accused, or to the conduct of the accused in remaining silent when he would naturally be expected to deny the accusation. (*Watt* v. *People,* 126 Ill. 9.) It is not the law that everything asserted in the presence of the party and not denied by him is to be regarded as

true, but the circumstance of silence is to be weighed by the jury as having a tendency, greater or less, according to its nature, to establish the fact stated by tacit admission. (*Mamer* v. *Lussem,* 65 Ill. 484.) Such statements are never admissible where the accused unequivocally denies the truth of the statements, (*People* v. *Harrison,* 261 Ill. 517,) nor are they admissible where by his conduct or by a statement made by him he shows clearly that he does not acquiesce in the statements. Where the accused said to the person making a statement implicating him in the commission of a crime, "You are crazy," it was held that there was no inference that he admitted the truth of the statement. (*People* v. *Wilson,* 298 Ill. 257.) This character of evidence is received on the same theory as other conduct indicating consciousness of guilt, like flight, withholding evidence and secreting witnesses. It is first of all conduct evidence, but by his conduct in remaining silent when charged with crime the accused acquiesces in the statement made in his presence, and it has the effect of an admission. It is uniformly held that where the accusing statement is made in a court room or during a judicial proceeding, failure to deny the statement does not raise an inference of acquiescence, because the dictates of decorum prevent the person from interrupting, (2 Wigmore on Evidence,—2d ed.— sec. 1072,) nor is a person accused of crime obliged to enter into a controversy with every idle straggler who may choose to accuse him to his face, nor is he bound to continue to shout his denial of every fugitive statement tending to implicate him that may reach his ears. (*Merriweather* v. *Commonwealth,* 118 Ky. 870, 82 S. W. 592.) Both the Federal and State constitutions guarantee to every person accused of crime the privilege of silence, and for three-quarters of a century our Criminal Code has provided that the failure of the accused to testify shall not create any presumption against him. If proof of silence under accusation is of itself sufficient to justify a conviction of crime,

then the provision of the Criminal Code which denies to the prosecution the privilege of commenting upon the fact that a defendant has not testified is not based on reason. The only sound reason for holding this character of evidence relevant is because it is the nature of innocence to be impatient of a charge of guilt whenever seriously made and distinctly understood, and an innocent person will usually spontaneously deny the accusation and challenge immediate investigation of the charge.

The evidence regarding the statements made in the presence of plaintiffs in error is in the record in such rambling fashion that it is difficult to determine the exact circumstances under which they were made. When Dasso took Crudelle and Charles to the farm to act the killing as told by Charles, it appears from the record that they went through the house on the Nitti farm, went about the barnyard locating the wagon and hitching the horse to the wagon, and drove from the barnyard to the· canal, and that Charles was reciting his story during all this time. Just how much of it Crudelle heard and understood is not clear. According to Dasso the only reply made by Crudelle was the statement made by him when Charles pointed out a certain spot and said that that was where Crudelle fell down while carrying Frank Nitti's body to the bridge over the canal. Crudelle characterized this statement as "b—— s——," and by such characterization he said as plainly as words could say that the story was absurd and fanciful. Certainly the characterization could not be construed as an acquiescence in the statement. · Stritker, who was in position to hear what was said on this trip, did not testify on the trial. With the unsatisfactory and uncertain foundation laid, it was error to permit Dasso to recite this dramatization. The story of the occurrence in the State's attorney's office was recited by but two persons,—Dasso and James Nitti. Many other witnesses were present and at least some of them understood the Italian

language. Mike Nitti was there, and yet he was not called
as a witness to relate the circumstances under which this
interview was held. Mrs. Nitti was crying and moaning
while Charles was telling his story, and there is no proof
that she heard or understood what he said. When asked if
she killed her husband she replied in Bari dialect, and her
reply is translated by the two witnesses testifying, to the
effect that she said, "Whatever Charlie said, that is true."
When pressed on cross-examination for the Italian words
used by her, James said they were, "Come parle." No at-
tempt was made to have these words translated by a dis-
interested interpreter, and counsel now appearing for the
plaintiffs in error, who know and understand the Italian
language, assert that there are no such Italian words. It is
strange that Crudelle was not asked directly whether he
was guilty of this murder or whether the story told by
Charles was true. No witness said that any question was
ever asked of him from the time he was arrested until he
was placed on the witness stand. Crudelle was not given
an opportunity to reply to the statement by Charles in the
State's attorney's office. It is not unreasonable to assume
that he might have understood that he was being tried for
the crime and that this was a judicial proceeding. He had
been in jail for some time and was taken from the jail to the
criminal court building, and there, in the presence of a num-
ber of persons, he heard Charles tell his story. Whether he
was in a position to hear all that Charles said, or whether
he understood what was said, is not shown. The evidence
shows only that he was in the room with ten or twelve other
persons and that questions were being asked and answers
given in both the English and the Italian languages. After
the inquisition closed, as far as this record shows, he was
immediately taken from the room by the officers and was
given no opportunity to reply.

Now let us take the case against each of these plaintiffs
in error and see on what the judgment of conviction stands.

As to Crudelle there is not a single act or word attributed to him which implicates him in this crime except that he did not repudiate the statement made in his presence by Charles. Eliminating this circumstance of silence, there is no competent evidence which shows that Crudelle was guilty of immoral conduct with Mrs. Nitti, or that he ever had any trouble with Frank Nitti. No person, as far as this record shows, has ever accused him directly of killing Nitti or has ever given him a specific opportunity out of court to say that he did not kill him. The first time the question was directly put to him was on the witness stand, and there he made a direct denial of his guilt, and there is not a thing shown in his cross-examination that in any way involves him in the crime. Mrs. Nitti's conviction rests only upon the implied confession of guilt from the statement made by her in the State's attorney's office, her exclamations when she was arrested, and the deductions to be drawn from the testimony of Mrs. Volpe. The story told by Mrs. Volpe is not corroborated by anything else in the record and is directly denied by Mrs. Nitti. The exclamations made when she was arrested the second time are not necessarily admissions of guilt. She had been released from three months' imprisonment because her husband's body had not been found, and after a body identified as his was found, it is not strange that this simple, illiterate Italian peasant might think her last hope of escape from imprisonment was gone notwithstanding her innocence. Charles Nitti in effect repudiates the story which it is said he told in September and now denies that he knows anything about the disappearance of his father. The fact that the body which it is said was the body of Frank Nitti was found in a catch-basin a mile and a quarter from the place where Charles in his statement said it was thrown into the canal raises a very serious question of the truth of the statement. Dasso says that he "drummed" at Charles for a long time until he made him tell the story which he did tell,

The body is identified by identifying a ring and a pair of shoes which were found with the body. No person attempted to identify the trousers, which were in a good state of preservation, or the belt, which appeared to be a piece of harness and could probably have been identified. Mike was employed on his father's farm and was as familiar as any person could be with the clothes worn by his father. He saw the body taken from the catch-basin and was present at the undertaking establishment when an examination was made of the body and the clothing. He did not testify in this case, and there was no effort, as far as this record shows, to have him identify the ring, the trousers, the belt, the underclothes, the socks or the shoes. There was some black hair on the back of the neck of the body found in the basin, but no one testified that deceased had black hair, nor does anyone testify that deceased was a man of the apparent weight of the body found.

All of the evidence on which these convictions rest is circumstantial. The court did not instruct the jury as to the value of the circumstance of silence. There is no instruction which tells the jury how such evidence is to be considered and what value is to be given it. There is no instruction which tells the jury that they have a right to consider whether the characterization of Charles' story by Crudelle as "b—— s——" was an express declaration by him which showed that he did not acquiesce in the story. There was no written instruction telling the jury that statements and acts at the farm in the presence of Dasso were not admissible against Mrs. Nitti. The jury were not told that Mrs. Volpe's story of her conversations with Mrs. Nitti was not evidence against Crudelle. Proper instructions were not offered, but the court, in a case of this kind, on its motion might with propriety instruct the jury as to the value that should be given such evidence. True, it is not the duty of the court to prepare instructions; but where there is great probability that the accused has been illegally

312—7

condemned by the jury because it has misapplied the law in weighing certain evidence, an appellate court will direct the case to be submitted to another jury. *Falk* v. *People*, 42 Ill. 331.

In support of the motion to vacate the judgments, plaintiffs in error filed affidavits stating that they did not employ the attorney who appeared for them at the trial; that they were without means; that he was either employed by someone else or volunteered to represent them; and that they are unfamiliar with court procedure and relied upon their attorney to properly present their defense. Charles Eisele, chief of police of Berwyn, states that about five o'clock in the morning following the disappearance of her husband Mrs. Nitti came to him and said that her husband had disappeared and asked that a search be made for him; that, accompanied by Charles Nitti and a police officer, he spent the morning looking for Frank; that he reported to Mrs. Nitti that he could not find her husband, and that upon hearing this she wept and tore her hair. John Cieslak states that shortly before he disappeared he saw Frank Nitti driving along the public road; that his face was bruised and so swollen that he was almost unrecognizable; that Nitti told him that his "bum son" did it. Mike Desant states that he was employed on the Nitti farm at the time of Frank's disappearance; that there was only one wagon with shafts on the farm; that he lived a mile from the farm and drove back and forth in this wagon; that he was visiting at the home of Nitti the night of July 29, 1922; that about eleven o'clock P. M. he left and drove to his home in Nitti's one-horse wagon; that the next morning he returned with the wagon and was told that Nitti had disappeared during the night; that he did not testify on the trial because Mike Nitti had threatened to kill him if he did testify.

Before the dread sentence of death is finally passed upon this man and woman on evidence as uncertain and unsatisfactory as that on which this conviction stands there ought

to be a further investigation, with competent counsel representing the accused. Safety and justice require that this cause be submitted to another jury.

The judgments are reversed and the cause is remanded to the criminal court of Cook county.

*Reversed and remanded.*