(No. 21212.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THOMAS NEY, Plaintiff in Error.

*Opinion filed June 24, 1932.*

EVERETT JENNINGS, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. COMMISSIONER EDMUNDS reported this opinion:

Thomas Ney was convicted in the criminal court of Cook county of the murder, by abortion, of Alma Bromps, and his punishment was fixed by the jury at fifteen years in the penitentiary. Motions for a new trial and in arrest of judgment were overruled and judgment was entered on the verdict. The cause is here on writ of error.

Bob Berry testified that he met Miss Bromps in September, 1930; that she was nineteen years old at that time; that he twice had intercourse with her in November of that year; that he was engaged to be married to her on Christmas day and went out with her constantly afterwards; that about the 15th or 16th of April, 1931, he had a conversation with her and after that conversation telephoned plaintiff in error at his office, 7110 Stony Island avenue, Chicago; that the same night, after making this telephone call, he went to the office of plaintiff in error; that witness talked first with Mabel Boggs, plaintiff in error's nurse; that plaintiff in error then came in, and witness, giving his own name as Robert Webster, told plaintiff in error that witness' youngest sister was pregnant, that he understood plaintiff in error took care of abortion cases, and that he would like to have him take care of this case; that plaintiff in error said he charged $50 for taking care of such cases and told witness to bring her up any time; that he took Miss Bromps to the office of plaintiff in error the

next evening; that plaintiff in error asked if that was the girl witness was speaking about, and witness replied she was; that plaintiff in error said "all right" and asked her to come into his private office; that just before he went in he said, "You can pay me now if you want to;" that witness paid him in cash and asked for a receipt; that plaintiff in error said he would give him a receipt after he got finished; that witness never got a receipt; that he remained in the reception room while plaintiff in error, Mabel Boggs and deceased were in the private office; that in about ten minutes the three came out; that witness and Miss Bromps went back there five consecutive nights after that; that several times plaintiff in error said to bring her back; that after the fifth visit witness took her home and she went to bed; that the following morning, April 23, she took sick at work and had to go home; that witness saw her in bed at three o'clock that afternoon and called plaintiff in error, telling him Miss Bromps was pretty sick and asked him to come and see her; that he did not come but Mabel Boggs did; that witness did not see Mabel do anything; that he called plaintiff in error the next day and he and Mabel came and went into Miss Bromps' room; that witness was not in the room all the time plaintiff in error and Mabel were there; that before they left witness asked if Miss Bromps was all right, and plaintiff in error said she would be all right and not to worry; that he called plaintiff in error the next day and told him Miss Bromps did not seem to be getting any better and witness would like to call in another doctor; that plaintiff in error said not to do that—that he would come and bring another doctor; that he came that night, bringing Dr. William White; that both doctors went into Miss Bromps' room; that witness was not in the room all the time; that Dr. White said she was pretty sick—"better send her to a hospital right away;" that plaintiff in error agreed, and said "if anyone should ask us any questions, tell them

nothing;" that he said absolutely not to mention that any instrument had been used at all; that at Dr. White's suggestion witness called Dr. William T. Carlisle at St. Luke's Hospital and Dr. White talked to him; that plaintiff in error and Dr. White then left; that Dr. Carlisle arrived about five minutes later and remained about ten minutes, and that an ambulance was called and witness went along with Miss Bromps to the Cook County Hospital.

Katherine Kolb testified that in April, 1931, she ran a rooming house and rented rooms at 2358 Indiana avenue, Chicago; that Miss Bromps was living there during that month; that on the afternoon of April 24 witness saw plaintiff in error and another doctor come out of Miss Bromps' room; that she recognized Berry's voice in the room, also; that while they were in the room she listened through the door and heard Miss Bromps screaming; that a voice said that they were recommending a doctor from St. Luke's Hospital and she had to go there, and this doctor was a "cracker-jack" and would pull her out of her condition; that a voice further said they should not say a word to anybody who sent them over there and who treated her or anything; that she asked plaintiff in error who he was, and he said he was a doctor, giving his name as Snyder; that about twenty minutes after they left the doctor from St. Luke's came and witness saw Miss Bromps being removed, and that she looked at the bed in which Miss Bromps had been and the bed clothes were soaked with blood.

Dr. William T. Carlisle testified that he was an assistant in gynecology on the staff of St. Luke's Hospital; that on April 24, 1931, he received a telephone call with reference to Miss Bromps from a party representing himself as her husband; that someone else got on the telephone and asked witness to take Miss Bromps to St. Luke's Hospital; that he then understood the name of this latter as Dr. Wright but later ascertained it was White; that Dr. White said the

patient had some serious complication of appendicitis; that there were no doctors with Miss Bromps when witness arrived at her room; that he examined her and found her in a stuporous condition, with a markedly distended and tense abdomen; that there were blood-stained cloths around her vulva and vagina and stains on the bed clothes; that her temperature was 102 and pulse rapid; that in his opinion she was not then suffering from acute appendicitis but that the distended condition of the abdomen at that time was due to generalized peritonitis, and that he had her sent immediately to the Cook County Hospital.

Dr. Edwin J. DeCosta, resident physician at the Cook County Hospital attending obstetrics, testified that he examined Miss Bromps there; that she was acutely ill—practically "in extremis" at the time; that her abdomen was distended, peristaltics were absent and she had free blood inside her abdominal cavity; that her skin was ectoric, her pulse about 141 and her temperature 107; that she presented the findings of a generalized peritonitis; that he examined the vagina, which had a small amount of blood, and that the opening to the womb was dilated.

Dr. Samuel Levinson, coroner's physician who performed the autopsy on Miss Bromps on April 26, 1931, testified that her skin was ectoric and her abdomen distended; that her pubic hairs had been shaved; that upon opening her abdomen he found an excessive greenish-gray sticky fluid in the lowermost part of the abdomen; that her intestines were greenish-red and their covering matted together by a thick, pus-like fluid; that the part of the intestines in the pelvic floor region were greenish in color, showing gangrenous changes; that she had a marked hyperemia in the lungs, with clots right in the vessels leading to the lungs; that her heart was soft and flabby and the heart muscle cloudy in appearance, showing it had undergone degenerative processes characteristic of a septic condition; that the liver presented a similar septic change;

that the spleen was enlarged, soft and purplish-red and when cut open the pulp could be scraped away with ease; that the uterus was markedly enlarged; that the cervix (the opening leading to the uterus) was dilated, open and very soft; that the fundus of the uterus had placental tissues that had a very foul odor; that placental tissue is not found in any cases except in pregnancy; that when he cut into the uterine muscle and applied pressure to it there was free blood and a dirty-like exudate came out; that he was able to press blood out of the fallopian tubes; that when he cut into the ovary there was a large corpus luteum, with several luteum cells surrounding it, and the ovary itself was filled with pus cells, showing infection of the ovary as well as of the uterus and tubes; that he preserved the uterus, fallopian tubes and ovaries in a jar then identified; that the uterus therein was not a normal or non-pregnant uterus but indicated from its enlargement a pregnancy of three to four months; that under normal circumstances the mouth of the uterus is closed, firm and hard; that the opening of this one was dilated and soft and had an impression in the upper lip which would indicate that there had been manipulation of some sort; that he cut out part of the tissues of the uterus, fallopian tubes and ovary to make microscopic tests; that such tests were made; that the section from the uterus showed the wall of the uterus was markedly thickened, and distributed throughout the entire surface of the uterus were pus cells; that the inner lining of the uterus, containing evidence of residual cells, fibers and blood, indicated microscopically placental tissues; that the section from the fallopian tubes was covered with pus cells, indicating a pus infection of the tubes; that the section from the ovary showed large groups of luteum and the ovary itself was filled with pus cells; that in his opinion Miss Bromps was pregnant; that she had a septic condition of the uterus; that pus involved both tubes; that she died of a purulent peritonitis, resulting from the pus

going out of the uterus through the tubes into the abdominal cavity and the pus infection getting into the blood stream, producing a septic condition which caused the degenerative changes of the heart muscle and liver and produced an acute septic spleen.

Plaintiff in error did not take the stand. The only witnesses called by the defense were Mabel Boggs and Dr. White. Mabel Boggs testified that she was a practical nurse and had worked for plaintiff in error from June, 1930, to the first part of May, 1931; that she had seen Miss Bromps at the office of plaintiff in error, Berry being with her the first and second times she came; that the next time she saw Miss Bromps after that was when plaintiff in error sent her to Miss Bromps' home; that witness there gave her an enema; that while the enema was being given Berry was in the room next door; that she talked to Berry after giving it, saying to him that it looked like appendicitis, and that Berry said she had chronic appendicitis.

Dr. White testified that he visited Miss Bromps at the request of plaintiff in error, who told witness she was turning yellow and he was not sure of the diagnosis of the case; that witness examined her at her room; that she was suffering from peritonitis and was in a serious condition; that her pulse was about 152 and her temperature 102.8; that he recommended that she be taken to a hospital; that Berry, who introduced her to witness as his wife, wanted her sent to St. Luke's Hospital, and witness recommended Dr. Carlisle; that he made no vaginal examination and saw no blood; that he saw the abdomen was greatly distended; that Miss Bromps was conscious all the time he was there, and that when he went outside he found Mrs. Kolb going from door to door trying to block the passage of witness and plaintiff in error, and witness told her the case was not to be discussed with strangers, asking her if she did not think most of the people there were over age.

The first contention of plaintiff in error is that he was inadequately defended. Assuming this to be the case, it does not follow that he can for that reason call upon this court to reverse the judgment. His defense was conducted by counsel of his own choosing. In *People* v. *Barnes*, 270 Ill. 574, we said: "But is it to be permitted that a defendant who is able to and does employ his own counsel, may after conviction employ other counsel to try his case in the higher courts and secure a reversal of the judgment on the ground that defendant had not been properly represented on the trial? We should be very reluctant to establish so dangerous a precedent. * * * A court of review cannot reverse a judgment of conviction in a criminal case where, in looking backward over the trial, it might seem defendant's counsel had made some tactical blunder." Persons accused of crime have the right to choose their own counsel and method of procedure in the conduct of their defense within lawful bounds, and a court of review will not, upon a change of counsel, consider the question whether, if objections had been made or questions raised which were not made or raised on the trial, a different judgment might have resulted. (*People* v. *Thompson*, 321 Ill. 594.) Failure of counsel employed by defendant to exercise care and skill in the trial court does not change the rule that this court reviews only the record, and where a party employs counsel of his own selection this court will not reverse the judgment of the trial court on the ground that he has not been properly represented. *People* v. *Zwienczak*, 338 Ill. 237; *People* v. *Hartwell*, 341 id. 155.

Plaintiff in error calls attention, however, to the following statement of this court in *People* v. *Nitti*, 312 Ill. 73: "The fact that the accused is poorly defended will not justify the reversal of a judgment where it is reasonably supported by satisfactory evidence, but it is proper to take such fact into consideration in a case of this character in determining whether the accused has been legally convicted."

The argument is, that allegedly prejudicial acts of the trial judge, coupled with failure of counsel for plaintiff in error at the trial to object thereto, deprived plaintiff in error of a fair and impartial trial. He summarizes the alleged shortcomings of counsel at the trial by saying that said counsel "did not object to the conduct of the court in examining in chief at great length the witnesses for the prosecution and cross-examining witnesses for the defense; did not object to the repeated and unnecessary repetition by the court of culpatory evidence by the prosecution after it had been brought out by the court; did not object to the court's taking charge of and conducting the prosecution, and did not object to the court's lecturing witnesses and counsel for the defense and using the pronoun 'we' therein when and where the pronoun 'we' could refer only to the prosecution."

Speaking of the attorney who represented the accused at the trial in the *Nitti case,* we said that he "seemed to be unfamiliar with the simplest rules of evidence and incapable of comprehending the rules when suggested to him by the trial court." In another connection we said: "The attorney made some meaningless comment which showed clearly that he did not know how to protect the interests of his clients, and the court delivered to him a lecture on the law of confessions, covering eight pages of the abstract. The entire lecture seems to have fallen on stony ground. * * * There is no plausible explanation of such conduct on the part of an attorney who pretends to be representing persons charged with crime, if the attorney is of sound mind. * * * A layman of ordinary intelligence would have conducted a much better direct examination of this witness. * * * The fact that the defendants were ignorant, illiterate foreigners unacquainted with law or court procedure in this or any other country and unable to speak and understand the English language, requires that we take into consideration the gross incompetency and stupidity of counsel appearing for them. We have called attention to

but little of the incompetent testimony which was put into this record by the absurd cross-examination of witnesses by the attorney appearing for the defendants. It is quite clear from an examination of the record that defendants' interests would have been much better served with no counsel at all than with the one they had." It is essential to bear in mind that the court's statement in that case to the effect that a poor defense by counsel may be taken into account in determining whether the accused has been legally convicted was made with reference to defendants as "ignorant, illiterate foreigners" and to counsel whose "incompetency and stupidity" were so manifest that in the opinion of the court the defendants' interests "would have been much better served with no counsel at all." There is no indication in the record that plaintiff in error may be classified in the category of the defendants in the *Nitti case,* nor can it fairly be concluded from an inspection of the record that counsel representing plaintiff in error at the trial displayed any such degree of incapacity as that which counsel in the *Nitti case* demonstrated. The statement in that case thus invoked by plaintiff in error is therefore without conclusive bearing in the present connection. We have, nevertheless, examined the record with a view to considering whether plaintiff in error was accorded a fair trial, apart from any question as to whether objections to the court's acts were duly preserved. To set out in detail all of the matter referred to by counsel would prolong this opinion to great length and is unnecessary. The points made may be sufficiently understood by reference to portions of the record, only.

Counsel points out that after Berry had testified that he talked to Miss Bromps and then called plaintiff in error the court said, "You called the defendant here, Dr. Ney?" During Berry's direct examination, after he had testified that plaintiff in error and his nurse were present at the office, the State's attorney asked the bailiff to bring in the nurse, and the court then said, "Was that a hospital there?"

When Mabel Boggs was being brought in the court was asking Berry if he learned her name and then said, "Well, she is here; he will identify her, whoever she is." After Berry testified to giving plaintiff in error the $50 the State's attorney asked if he had the receipt, and Berry said he never got one. Thereupon occurred the following:

The court: "What did you do?

A. "I never got a receipt.

Q. "Oh, you asked him for a receipt and he gave you none?

A. "Yes, sir.

Q. "What did he say about it?

A. "He said he would give it to me after he got finished.

Q. "Did you ever get one?

A. "No.

Q. "You gave him the $50?

A. "Yes, sir."

After Berry testified that he and Miss Bromps were at the office on five consecutive nights the court asked, "Always in the private office when the alleged deceased here, Alma Bromps, went into the office?" After Berry testified that plaintiff in error said he would come to see Miss Bromps at her home but that he sent "the nurse" the court asked, "When you talked to Dr. Ney he said he would come, but this same woman you said was this Miss Boggs, she came?" After Berry testified that plaintiff in error said that Miss Bromps would be all right and not to worry, the court asked, "Did he say she would be all right, not to worry?" Further answers of Berry which counsel complains were unduly emphasized by questions of the court after Berry's answer was given pertained to the statement of plaintiff in error that Berry should not call another doctor and that plaintiff in error said if anyone asked questions about Miss Bromps to tell them nothing. After Berry testified that at the Cook County Hospital he met some doctor whose name he did not know there occurred the following:

The court: "Well, are you able to identify him?

A. "Yes, sir.

Q. "Is he here?

Mr. Murphy: "He won't be here until this afternoon.

The court: "All right; then we will identify him when he comes, if there is any question."

During the cross-examination of Berry by counsel for plaintiff in error there occurred the following:

Q. "And you do not know what kind of work Mrs. Boggs was doing in that private office?

The court: "Now, you ask the statement. Did you see her do anything?

A. "No, sir.

The court: "All right. Why do you ask questions— ·

Mr. Swalwell: "I am sorry, your honor; I am sorry.

The court: "Something they don't know about. I can bring ten million people in here that can tell what they do not know. We are not interested in that. We do not want witnesses to testify that they do not know anything about the case.

Mr. Swalwell: "Now, Mr. Berry, you do not know of your own knowledge what was wrong with Miss Bromps, do you?

A. "Yes, sir.

The court: "You better not ask that question.

Mr. Murphy: "He answered it.

The court: "Well, you have got the answer.

Mr. Swalwell: "Yes.

The court: "He said he did."

During the cross-examination by the State of Mabel Boggs the following occurred:

Q. "There is a case pending—

Mr. Swalwell: "Objection, if the court please.

Mr. Lavin: "Just a minute. We have a right—

The court: "What is it?

Mr. Swalwell: "If he wants to go into that we will go into it later, thoroughly.

Mr. Lavin: "She is before the felony court on a charge in connection with this case—

Mr. Swalwell: "All right; that is fine.

The court: "No, it is not fine."

We have often said that a judge should express no opinion concerning the veracity of a witness or the weight of the evidence and that he should exercise care not to convey to the jury his opinion of the merits of the case. (*People* v. *Carrico*, 310 Ill. 543.) We have also said that the examination of witnesses is the more appropriate function of counsel and the instances are rare and the conditions exceptional which will justify the presiding judge in conducting an extensive examination. It is always embarrassing for counsel to object to what he may deem improper questions by the court. The extent to which this shall be done must largely be a matter of discretion, to be determined by the circumstances of the particular case, but in so doing he must not forget the function of a judge and assume that of an advocate. *People* v. *Krejewski*, 332 Ill. 120.

Viewing the acts and statements of the court above set out, as well as the others complained of, in their relation to the record as a whole, it is apparent that many of them, at least, do not fairly bear the significance which present counsel for plaintiff in error seeks to attribute to them. With respect to the complaint against the court's repetition of answers given by the witness Berry, for example, the record shows that early in his examination the court said, "I requested you to talk louder. You don't talk up. That juror does not have to strain his ears." A little later the court said, "Now you are talking too fast and not loud enough." Still later the court said, "Now, Mr. Berry, you must talk up. Keep up your voice." Still later the court said, "A little louder," and the State's attorney also said,

"I can't hear you." It is obvious that the witness was inclined to speak in a tone which tended to make his answers unintelligible. The court was apparently endeavoring to verify them by repetition. While, perhaps, it would have been preferable to have stopped with a caution to witness to raise his voice and repeat his answers, it does not appear that the court in any way expressed any opinion with regard to the truth of the answers made, and we cannot, under the circumstances, say that the error was a prejudicial one. With respect to the use by the court of the term "we," the record shows that the court explained to the jury what he meant by it when he said at an early stage of the trial, "We are trying this case, the court and the jury, upon the evidence that the court admits, and nothing else." Most of the allegedly improper examination of the expert witnesses conducted by the court and which is not set out in this opinion consisted only of questions dealing with the nature and functions of the female organs of generation and could not have been taken as having direct bearing on the question of the guilt of plaintiff in error.

That the court did not demonstrate bias against plaintiff in error but rather was alert to see that his interests were protected is shown conclusively by many portions of the record. He interposed frequent objections to the procedure of the State's attorney. Thus, he interposed and told witness Berry that Berry could not tell what Miss Bromps told him in the absence of plaintiff in error. After Berry had repeated his statement that Miss Bromps told him that plaintiff in error requested her to come back the court said, "Strike it out, and the jury will disregard it." When Berry started to volunteer information as to Miss Bromps' condition the court said: "Now wait, wait, wait. Don't volunteer anything. Wait till a question is asked." When the State's attorney asked Berry "what happened" while Miss Bromps was in bed the court said: "Well, now, that is not a proper question about what happened. We don't

allow improper testimony. Ask your questions properly."
After Berry testified that he left the room while plaintiff
in error and Mabel Boggs were at Miss Bromps' home the
State's attorney asked, "How did you happen to leave the
room?" The court said, "That won't do; that is not a
proper question." The State's attorney later asked Berry
if before plaintiff in error and Dr. White left Miss Bromps'
room he observed their condition with reference to sobriety.
Thereupon the following occurred:

Mr. Swalwell: "Just a minute.

The court: "Wait a minute.

Mr. Swalwell: "Just a minute. It is irrelevant and im-
material.

The court: "Wait a minute; I heard it. What has that
got to do with this case?

Mr. Murphy: "Just a minute.

The court: "Tell me now.

Mr. Murphy: "The jury has a right to know."

The court sustained the objection, whereupon counsel
for plaintiff in error said, "And the jury instructed to dis-
regard it." The court said: "Why, of course; they have
heard nothing," and proceeded to tell them they were trying
the case only on the evidence admitted. Then occurred the
following:

Mr. Murphy: "All right. Now, was anything said by
Dr. Ney or anything done by Dr. White with reference
to gin?

Mr. Swalwell: "Now, I object, if the court please.

The court: "Gentlemen, I made one ruling.

Mr. Murphy: "Just a minute. I have a right to refresh
his recollection.

The court: "I ruled that is not competent.

Mr. Swalwell: "Just a minute—

The court: "It does not have anything to do with this
lawsuit. Don't ask it. Don't do it."

After further colloquy the following occurred, Lavin being an assistant State's attorney:

Mr. Lavin: "Could I speak, your honor, outside of the jury?

The court: "I have not time to talk about it. I heard your opening statement. I heard counsel say that somebody was going to offer somebody some gin. Is that what you want to show?

Mr. Lavin: "Yes.

The court: "Well, it is not competent.

Mr. Lavin: "All right.

The court: "Do I have to run a law school here?

Mr. Lavin: "We will not ask this.

The court: "You are trying to. Gentlemen, I want you to try this case upon legitimate evidence. Go on and put another question."

After still another colloquy the following occurred:

The court: "And I don't know why the State's attorney cannot try cases and do nothing more than try the cases on legitimate evidence and not try to get something in the case that may be prejudicial. It is done right along, and in this court I will not allow it.

Mr. Murphy: "I will ask the court to refrain from making such a remark.

The court: "I will not.

Mr. Murphy: "Those remarks are prejudicial to the State's case.

The court: "They are, and they are justifiable when the State's attorney—

Mr. Lavin: "I do not think they are.

The court: "Listen, Mr. Lavin. It does not make any difference what you think."

After still further colloquy the court said, "There seems to be an atmosphere among certain State's attorneys to go outside of the legitimate evidence." Lavin insisted that the court knew better than to attribute unfairness to him,

and the court asked, "Do you want me to attribute it to ignorance?" Finally the court concluded: "Now, let's try this case on legitimate evidence. I know just what I am doing."

In the course of the State's cross-examination of Mabel Boggs the court said: "I am not going to allow you to stand up here all day long on this examination. Bring it to a close." During the cross-examination of Dr. White the State's attorney asked him if he had not been indicted, whereupon the court said: "Wait a minute; wait a minute. That has nothing to do with this case," and told the State's attorney not to ask the question. Then occurred the following:

Mr. Lavin: "All right, your honor.

The court: "All right what?

Mr. Lavin: "I will abide by my decision.

The court: "Don't abide by anything. Don't you know the law?"

Mr. Swalwell: "Now, your honor, I would at this time like to make a motion that the court instruct the jury, and renew my motion to have struck from the record the question asked by the State's attorney."

Examination of the record will reveal many other instances in addition to the ones just referred to in which the court interposed objections to the procedure of the prosecution. The fair and proper conclusion to be reached from such examination is, that while the court undoubtedly made some statements which were not called for by one in his judicial position, and while he in some degree, at least, invaded the proper province of counsel on both sides in questioning witnesses, he showed no bias against plaintiff in error. Rather must it be said that he displayed continuing, and often emphatic, solicitude that plaintiff in error receive a fair and impartial trial. We are unable to conclude that he manifested to the jury any opinion as to the guilt or innocence of plaintiff in error or as to the credibil-

ity of any witness in the case. Taking into account the convincing nature of the evidence to support the verdict we would not be warranted in holding that there should be a reversal on account of the acts complained of.

Counsel cites and relies upon *People* v. *Cope,* 345 Ill. 278, *People* v. *Saylor,* 319 id. 205, *People* v. *Garines,* 314 id. 413, and *People* v. *Lurie,* 276 id. 630. In the *Cope case* the People were allowed to introduce in evidence an alleged confession of the defendant. After the People's case was closed defendant took the stand and testified as to the circumstances under which the confession was obtained, stating that he had been suspended from iron bars. The court said: "This defendant was questioned at length in the chambers and he never related anything about being suspended from iron bars." We said: "The effect of this was to inform the jury by the mouth of the court of what took place out of their presence, in violation of the constitutional right of the defendant to be confronted by the witnesses and to cross-examine them, and practically to exclude the evidence as untrue and to give to the jury the court's view of the weight and credit to be given the defendant's testimony." In the *Saylor case* the State's attorney refused to submit to rulings on the evidence and assumed to lecture the court on his conduct of the trial. Counsel for defendant did likewise. The trial lasted three weeks. The evidence was conflicting. We characterized the result of the trial court's failure to assert his authority as a "quarrelsome, brawling contention" and "an irregular, disorderly and turbulent proceeding." In the present case the complaint is not that the court asserted too little authority but that he asserted too much. In the *Garines case* the evidence was conflicting. The State's attorney remarked that defendant's evidence was "a lot of cooked-up stuff," and the court said, "We all know what it is; we are not blind." This court said: "This remark of the court was highly prejudicial. The court undoubtedly meant to in-

sinuate that the defendant's testimony was 'a lot of cooked-up stuff' and that his attorney could control his testimony if he desired. This impression is the only one that the jury could have received, under the circumstances." In the *Lurie case* the evidence was close. In a number of different connections the trial court made comments of a sarcastic nature, obviously reflecting upon the veracity of defendant and his witnesses. We said: "We are convinced that in the examination of the witnesses in this case the trial judge made statements and asked questions in such form as would almost certainly lead the jury to believe that he thought plaintiff in error was guilty of murder as charged in the indictment." In the present case we are dealing with an entirely different state of the evidence, and the acts of the trial court cannot be said to have been prejudicial to the defendant in any such manner as in the cases cited.

By agreement of counsel the jury were instructed orally. The charge thus given covers five pages of the abstract. After completing it the court asked counsel if he had omitted anything, and counsel for plaintiff in error asked for an instruction that guilt could not be inferred from the failure of plaintiff in error to take the stand. This was given. No objection to any portion of the charge was made by counsel for plaintiff in error and objection at this time is therefore unwarranted. However, we note the points made in order that it may be seen no reversible error was committed even had there been proper objection. The court said: "Perhaps I might start out by saying that in every criminal case, whatever the charge may be, the jury are the judges of the facts and the court is the judge of the law, so that from anything the court may have said or done in this case you are not to understand that the court has any opinion upon the merits of this case or upon the guilt or innocence of the defendant. It is for the jury to determine the facts and then apply to those facts the law

as the court has given to you, which law is binding on you, and if anything has been said by counsel on either side not fairly warranted from the law and the evidence you are to totally disregard any such statements, and if any evidence has been admitted and subsequently stricken out you are to regard it as though it never had been heard. In other words, you are to decide the case upon the evidence as it has been admitted, the law as given to you by the court and the arguments of counsel." Counsel objects to the last sentence quoted, on the ground that the arguments of counsel are not a proper basis for decision, and, moreover, that after the People made the opening argument plaintiff in error waived argument and therefore was not heard. The sentence in question must be considered in its relation to what preceded. The jury were clearly told that if anything had been said by counsel on either side not fairly warranted from the law and the evidence they should disregard it. In *People* v. *Cassin,* 322 Ill. 276, this court said that reference to the arguments of counsel might properly have been made in an instruction. Further on in the charge the court said that if the jury were convinced "from the evidence," beyond a reasonable doubt, that defendant was guilty, it would be their duty to find him guilty of whatever offense they might determine, "under the law and the evidence, he is guilty of." We are unable to conclude that plaintiff in error was materially prejudiced in this connection.

Plaintiff in error contends that reversible error was committed in giving the following instruction:

"The burden is on the State, and the law presumes the defendant to be innocent and requiring proof beyond a reasonable doubt, the jury must arrive at their conclusion from the evidence in the case. Now, evidence sometimes is called direct evidence, and sometimes is called circumstantial evidence, and circumstantial evidence is legal and competent evidence, and so if from all the evidence in this case,

whether that evidence be direct or circumstantial, if the jury are convinced of the guilt beyond a reasonable doubt, it is their duty to so find. If on the other hand, they are not convinced beyond a reasonable doubt of guilt, whether of the graver offense or the lesser offense, it is their duty to find a verdict of not guilty."

It is argued that this charge was calculated to confuse the jury because it was open to the construction that evidence could be at once direct and circumstantial, and that what was meant by circumstantial evidence should have been elucidated by further definition. Both here and elsewhere in the instructions the jury were emphatically limited to a consideration of the evidence in the case, and in our opinion plaintiff in error could not have been seriously prejudiced by the manner and form in which the charge was given.

The instruction given with reference to the failure of plaintiff in error to take the stand is given in the abstract as follows: ·

"Under the law of Illinois, the defendant is a competent witness to testify in his own behalf or not, as he pleases. He may or may not take the witness stand at all. Having taken the witness stand in this case, you have no right to be prejudiced against him on that account, nor have you any right to draw any inference of guilt against him because of the fact he has not testified."

Counsel argues that because plaintiff in error did not take the stand the instruction is "absurdly contradictory" and must have prejudiced the jury against him. Whether or not, as counsel for the People assert, the report of the court's words was erroneous in omitting the word "not" before the words "having taken the witness stand," it is not apparent how the jury could have been seriously misled by failure to use such word.

Plaintiff in error contends that it was reversible error for the court, when his counsel asked for the instruction as

to failure to take the stand, to make the remark that he would give it but that it was going to be harmful. The remark should not have been made, but under all the circumstances disclosed it did not constitute reversible error.

The judgment of the criminal court is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment affirmed.*